THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROBERT BRENSIC, Appellant.

Second Department, September 22, 1986

## APPEARANCES OF COUNSEL

*Barrett Smith Schapiro Simon & Armstrong (Mary B. Corrarino* of counsel; *Eric Berry, Joshua Friedman* and *Eric T. Schneiderman* on the brief), for appellant.

*Patrick Henry, District Attorney (Mark D. Cohen* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

The defendant stands convicted of the crimes of murder in the second degree and manslaughter in the first degree as a result of his participation, along with three other youths, in the tragic and brutal killing of 13-year-old John Pius on April 20, 1979, in Smithtown, New York. The evidence adduced at the trial established that the four youths killed Pius by beating him and shoving rocks down his throat in the belief that Pius had observed them in possession of a stolen motorbike.[1]

The primary issue raised by the defendant on appeal is whether the trial court properly admitted into evidence, under the declaration against penal interest exception to the hearsay rule, the custodial confession of an accomplice, Peter Quartararo. We conclude that under the circumstances of this case the confession was properly admitted into evidence, and, having reviewed the defendant's remaining contentions, affirm the instant judgment of conviction.

### THE FACTS[2]

We begin with a review of the trial testimony.

A. *The People's Case*

On the evening of April 20, 1979, John Pius, a 13-year-old youth was working with his father on his bicycle in the garage of his family's home in Smithtown, New York. At approximately 8:15 P.M., Pius asked his father if he could test-ride his bicycle by riding over to the Dogwood Elementary School located a few blocks away. Pius expected his friend Eddie Pembroke to be at the school. Mr. Pius permitted his son to go to the school but instructed him to return within 15 minutes. At approximately 8:25 P.M., Gail Pembroke, Eddie Pembroke's sister, observed Pius on his bicycle, pedaling "real fast" in the direction of the Dogwood School.

When Pius failed to return home by 9:15 P.M., Mr. Pius drove to the Dogwood School to look for him. After walking

---

1. Michael and Peter Quartararo, who were also accused of participating in the Pius killing, were each convicted following separate trials of two counts of murder in the second degree. Their judgments of conviction were affirmed by this court (*see, People v Quartararo,* 113 AD2d 845, *lv denied* 66 NY2d 921). The fourth youth involved in the killing, Thomas Ryan, was similarly convicted of two counts of murder in the second degree. Ryan's judgment of conviction is currently on appeal in this court.

2. The defendant's first jury trial was terminated by an order of the Supreme Court, Suffolk County (Doyle J.), which granted a mistrial during the People's case.

around the schoolyard grounds, Mr. Pius canvassed the neighborhood for about 15 to 20 minutes but was unable to locate his son. Mr. Pius then stopped by the Pembroke residence and was informed that Eddie Pembroke had not seen John Pius that evening. Thereafter, Mr. Pius returned home and notified the police that his son was missing. The police arrived at the Pius home at 11:00 P.M.

### Discovery of Pius' Body

At 4:00 A.M., Mr. Pius telephoned Eddie Pembroke and requested that the youth show him the tree house which he and Pius had been building in the area of Pembroke's home. Their search of that location proved futile.

Later that morning, Mr. Pius and several neighbors conducted a search of the Dogwood schoolyard. At approximately 10:30 A.M., two neighborhood youths who had been playing in the schoolyard discovered Pius' bicycle, wallet and cap in a wooded area of the yard. One of the youths took the cap, but the bicycle, which was lying on its side, was not disturbed. Pius' wallet was turned over to a baseball coach who was on a nearby field. The coach subsequently contacted Mr. Pius by telephone and informed him that his son's wallet had been found. After retrieving the wallet from the coach's home, Mr. Pius returned to the schoolyard with several relatives and neighbors to conduct a further search of the school grounds. During the search, Mr. Pius' niece observed Pius' bicycle lying on the ground underneath some leaves. The niece picked the bicycle up and leaned it against a nearby tree stump.

At approximately 1:20 P.M., Joseph Sabina, one of the Pius' neighbors, discovered John Pius' body covered with leaves and branches and lying on the ground in a wooded area of the schoolyard. A log covered the right side of Pius' head and another log covered his legs. Sabina moved the logs away from the body and then notified Mr. Pius of his discovery.

Detective Thomas Gill of the Suffolk County Police Department's Homicide Squad responded to the scene at approximately 2:30 P.M. He inspected the body and observed drag marks in the dirt from the area of the tree stump where Pius' bicycle rested. The detective then conducted interviews with several persons who were present at the scene, including Sabina, who described his observations upon discovering the body. When Sabina informed Detective Gill that he had moved the log which had been covering the decedent's upper body,

the detective instructed him to keep the information concerning the condition of the body a confidential matter.

The defendant, who had been riding around the schoolyard on his bicycle while the police investigation was being conducted, was also questioned. In response to Detective Gill's inquiry, the defendant stated that he was familiar with the Dogwood Elementary School area although he did not know the youths who frequented the area because he lived in another section of town. The defendant also stated that he usually "hung out" at the Smithtown High School East. The defendant further explained that he had been delivering newspapers in the immediate area when he saw the police in the schoolyard. He rode over to the yard to watch the investigation.

Members of the Suffolk County Crime Laboratory and the Medical Examiner's office responded to the scene later that afternoon. Various items were collected from the immediate vicinity of the body and footprint cast impressions of several prints around the body were taken. The autopsy conducted on Pius' body later that day revealed that six stones had been placed in the youth's mouth, five above the tongue and one below the tongue, which blocked his air passages. In addition to multiple bruises to the body, there were sneaker marks on Pius' cheek which were determined to be consistent with someone standing on his throat and placing rocks in his mouth. The sneaker print impression was similar to three brands of sneakers, i.e., Puma, Fayva and Spec sneakers. The cause of death was attributed to a combination of asphyxia and multiple contusions and lacerations in and about the chest and neck area. The time of death was estimated to be between 12 and 24 hours prior to the autopsy.

### Initial Police Investigation

The police investigation of the Pius murder originally centered on three local youths, John Sparling, Michael O'Neil and Raymond St. Dennis, who had been seen in the area of the schoolyard on the evening of April 20, 1979. When O'Neil and Sparling were first interviewed by the police a few days after the murder, they denied being in the area of the schoolyard on the evening in question. Several days later, O'Neil and Sparling were separately brought to the police precinct for questioning. At that time, the police learned that O'Neil, Sparling and St. Dennis had gone to a local beer and soda

distributorship in Smithtown on the evening of April 20, 1979, at approximately 7:00 P.M. Sparling met a friend at the store who purchased a case of beer for the three youths. While outside the store, the youths observed a yellow Capri automobile which belonged to Thomas Ryan pull up to the store. The occupants of the car were the defendant, Peter and Michael Quartararo, and Ryan. O'Neil, Sparling and St. Dennis approached the car and, after conversing with Ryan, they sold Ryan and his friends a six pack of beer. Thereafter, O'Neil telephoned his brother from a nearby telephone booth and made plans to see a midnight movie.

O'Neil, Sparling and St. Dennis left the beer and soda store at approximately 8:00 P.M. and walked in the direction of the Dogwood School. As the youths proceeded by the front of the school, they observed Ryan's car coming out of the schoolyard. The defendant was riding a motorbike alongside the car and was holding onto the car door. O'Neil yelled out and asked the other youths to stop but Ryan's vehicle and the defendant continued out of the schoolyard and turned onto Rice Lane. O'Neil, Sparling and St. Dennis then walked to a nearby housing development located approximately 100 to 150 yards away from the Dogwood School where they drank beer for a few hours.

In addition to suspects O'Neil, Sparling and St. Dennis, the police also investigated a local youth named Robert Burke, who had a history of violent behavior and who the police felt might have some connection with the Pius murder. Burke was alleged to have bragged to several neighborhood youths that he had killed Pius. Burke ultimately established an alibi for his whereabouts on April 20, 1979.

The defendant was also questioned by the police several days after the murder while he was with Ryan and the Quartararo brothers at the local high school. At that time, the defendant advised the police that he was not at the Dogwood School on the night of the murder but, in fact, was at a high school baseball game. It was subsequently determined that no game was played that night at the high school.

### Police Investigation of the Defendant, Ryan, and Peter and Michael Quartararo

On the morning of April 28, 1979, Detectives Fountain and LaValle of the Suffolk County Police were instructed to conduct a surveillance of Robert Burke's home. The detectives

began their two-hour surveillance at approximately 8:00 A.M. No activity occurred during that time, and when the detectives contacted their supervisor at 10:00 A.M., they were instructed to conduct surveillance of the O'Neil residence. As they were watching the O'Neil home, the officers observed a yellow Capri back out of a driveway down the street and drive by them. The detectives followed the car to a small shopping center where two youths exited the vehicle. The youths were later identified as Thomas Ryan and Peter Quartararo. After the detectives informed their supervisor of their activity, they were directed to request that Ryan and Quartararo accompany them to the precinct for questioning.

At the officers' request, the youths voluntarily agreed to submit to questioning. Ryan, then 17 years old, was transported to the Suffolk County Police Department's Homicide Squad. Quartararo, who was two days shy of 16 years old, was taken to the Juvenile Aid Station.

At 3:00 P.M. that afternoon, Detectives LaValle and Fountain were instructed to locate the defendant who was believed to be delivering newspapers in the vicinity of the Dogwood School. The defendant was subsequently located on Rice Lane near the school. The defendant agreed to accompany the detectives to the precinct, and he was transported in the police car after his bicycle was placed in the trunk of the car. Upon his arrival at the precinct at 3:45 P.M., the defendant was introduced to Detective Gill. At the commencement of the interrogation, the defendant was advised of his *Miranda* rights, which he waived. Detective Gill then reminded the defendant of the prior occasions on which he had spoken to the police about the Pius murder. Although the defendant insisted, as he had previously, that he had not been in the vicinity of the Dogwood School on the evening that Pius was killed, he admitted that he, Ryan and the Quartararos had bought some beer from O'Neil which they consumed at a high school baseball game that night. When the defendant was informed that O'Neil, Ryan and Peter Quartararo had stated that he, the Quartararos and Ryan were at the schoolyard and that he (the defendant) had stolen a motorbike on the evening of the killing, the defendant admitted that he stole the motorbike from a nearby housing development. The defendant also stated that when he was walking toward the schoolyard with the motorbike, he heard a scream coming from the development. Afraid that someone observed him stealing the motorbike, the defendant put the bike in Ryan's car and the youths

went directly to the Quartararos' home. Although he was advised that Ryan had indicated that Pius had passed Ryan's vehicle on Rice Lane as the motorbike which the defendant was riding was being towed out of the schoolyard, the defendant insisted that was not true and that, in fact, he went to Route 25A, turned right and went home. The police continued to question the defendant for several hours, and, thereafter, he was released.

### Post-April 1979 Confessions by the Defendant to Civilians

In early May 1979, the defendant, the Quartararos, Brian Dunn and O'Neil were sitting in the bleachers at the Smithtown High School. While the youths were conversing about the Pius killing, the defendant turned to Peter Quartararo and said, "I wouldn't have stepped on him if you didn't put rocks in his mouth".

In August 1979, the defendant was at the high school with several friends including one George Heiselmann. The group was discussing the Pius case among themselves and someone asked the defendant if he was in the Dogwood schoolyard on the evening of April 20, 1979. The defendant indicated that he was and when asked further if he killed Pius, the defendant replied, "[i]f you were drunk you would have done it".

In late September 1979, the defendant was in the company of several friends on the grounds of the St. James Elementary School when he was asked if he was still being investigated in connection with the Pius case. The defendant responded that "[t]he pigs fucked it up and that they'd never get him".

In February 1980, the defendant was an inmate in the Suffolk County Jail. While in the jail, the defendant was introduced to a fellow inmate, Brett Locke, who was the inmate representative of the jail tier where the defendant had been placed. On the day following his arrival at the jail, the defendant became the subject of harassment by his fellow inmates who were calling him "Pebbles" as a result of his alleged involvement in the Pius murder. Locke told the inmates to leave the defendant alone and then asked the defendant what he had done. The following conversation then took place:

"A Well, I asked him a few times what happened. And he was crying. And he broke out and said, 'I didn't mean to kill him. We didn't mean to kill him.'

"Q What else did he say?

"A I asked him what happened. And he told me what happened.

"Q What did he tell you happened?

"A He said that him and a friend of his, Tommy Ryan, and two Quartararo brothers were riding around in Tommy's car drinking and smoking. And that he knew where to rob a mini bike. And they went to the house. And we stole the mini bike from a garage or by a garage. And they met at the school. They were checking the mini bike out. And this little kid, John Pius, was riding a bicycle and observed him with the mini bike. And one of the brothers said they better go talk with this kid. Because he had problems with him in the school. And he'd rat him out about the mini bike.

"Q He said one of the brothers said that?

"A Yes. And Tommy Ryan said, 'No, don't worry about it. Everything will be all right. There's enough of us here to where he's not going to want to say anything about it.'

"And they put the mini bike back in the car and dropped it off at one of their houses. And the brother kept insisting that they better speak with the kid, because he's going to rat him out. He had a lot of trouble in school. He's definitely going to rat him out.

"So they went back by the school, somewhere in the area of the school. They found him and they called to him. And he's riding away on the bicycle. They caught up to him. And Robert punched him in the head. And he went down. And they all started punching him and kicking him. He started screaming real loud. And he said to put rocks in his throat, that will shut him up. And he stuck pebbles and rocks in his throat. And a little while later they realized he was dead. And Tommy Ryan said, 'Drag the body in the woods,' because he didn't want to put it in the car, get noticed with the body. He said, 'We'll drag it into the woods.'

"They dragged it into the woods and covered it over with some leaves and sticks and stuff like that. And that's all I listened to."

Locke did not inform anyone regarding the defendant's statement at the time it was made. The first time Locke spoke to law enforcement officials about the defendant's statement was in August 1981, when Locke was arrested on burglary charges. When he was arrested, Locke asked that the Homicide Squad be contacted because he had information about a

case. Detective Miller came to the jail and spoke to Locke. Locke offered to give Miller certain information about the Pius case if the detective arranged to have Locke released on his own recognizance. Miller had Locke released; however, Locke fled the area before he spoke to Miller. Locke eventually relayed the contents of defendant's statement to the District Attorney's office when he was arrested again on burglary and drunk driving charges. As a result of his cooperation, Locke was permitted to plead to a reduced charge.

### Peter Quartararo's Confession

During the course of the defendant's trial, the People sought to introduce into evidence, over the defendant's objection, the custodial confession given by Peter Quartararo on April 28, 1979, as a declaration against penal interest.[3] Subsequent to the preliminary arguments on the prosecution's offer of proof, Peter Quartararo was called as a witness by the prosecution, and when questioned out of the presence of the jury about his participation in the Pius murder, he invoked his 5th Amendment privilege against self-incrimination. Pursuant to the prosecution's application to declare Quartararo an unavailable witness, the court conducted a *Settles* hearing *(see, People v Settles,* 46 NY2d 154) to determine whether Quartararo's statement, which incriminated the defendant in the killing, was admissible as a declaration against penal interest. At the conclusion of the hearing, the trial court ruled that while Quartararo had made several incriminating statements during his interrogation by the detectives on April 28, 1979, only that statement made while his mother was present and after he was advised of his *Miranda* rights could be introduced into evidence as a declaration against penal interest. Additionally, the trial court determined that in order to avoid 6th Amendment right-of-confrontation issues and to limit the statement to self-inculpatory comments, the confession would be redacted to eliminate specific references to the other participants in the killing *(see, People v Brensic,* 118 Misc 2d 390).

---

**3.** Prior to the defendant's first trial, which, as stated in footnote 2 above, ended in a mistrial, the court (Doyle, J.) decided to admit the confession of Peter Quartararo as a declaration against penal interest. During the defendant's second trial, under review herein, the Trial Judge (Namm, J.) determined that while bound by any previous pretrial hearing rulings as the law of the case, he would not be bound by previous evidentiary rulings made by Justice Doyle *(see, People v Brensic,* 118 Misc 2d 390, 390-391).

Following the trial court's ruling, Detective Palumbo testified that he conducted the interrogation of Peter Quartararo on the afternoon of April 28, 1979. The interrogation commenced at or about 2:30 P.M. and during the afternoon Quartararo was transported to the Dogwood School and was also given dinner at a local restaurant. At approximately 8:30 P.M., Quartararo's mother, whom the police had attempted to contact several times that afternoon, and his brother, Michael, arrived at the precinct. The Quartararo youths were advised of their *Miranda* rights; Michael Quartararo was then escorted out of the room. After Peter Quartararo voluntarily waived his rights in the presence of his mother, he stated that on April 20, 1979, he, along with three other people, had purchased beer at a local beer distributorship at approximately 8:00 P.M. Detective Palumbo related the balance of Quartararo's statement, as follows:

"He said that upon buying the beer, he and the three other people went to a development known as Point of Woods to steal a mini bike that was alongside of a garage of a house in that neighborhood. And that when they got to this neighborhood, one of the other people had gotten out of a car and had gone to steal the mini bike. And that while Peter and the two other people were waiting for this person to return, three boys on skateboards had been going up and down the street by the car. Peter indicated this made him nervous. And that they left the Point of Woods development and drove to the Dogwood Elementary School to wait for the fellow that went and stole the mini bike. He said that while—eventually up at the Dogwood Elementary School this other person came up a path which leads from the Dogwood Elementary School to the Point of Woods development. And that he had the mini bike with him.

"He said with that the other person hooked onto the side of the car and that they, Peter and the three other people, drove out of the schoolyard. And while doing so, at this point Peter said, saw O'Neil, Sparling and St. Dennis coming onto the school property from the opposite direction as to where they were on the schoolyard—on the school property. He said that they drove around—drove out of the schoolyard onto Rice Lane, drove in about 15 or 20 feet. And that they stopped the car. And that while two of the other people were putting the mini bike in the trunk of the car, John Pius came by on his bicycle headed in the direction of the Dogwood School. Peter

indicated that while he was going by, one of the other guys yelled to Pius, 'Pius, you dick.'

"With that they continued to put the mini bike in the trunk of the car. And that they drove from there, from Rice Lane, onto Peter Quartararo's house where the mini bike was stashed.

"Q Did he indicated *[sic]* what he did after that?

"A Yes, he did. He said that one of the other people indicated—excuse me—that they should go back and make sure Pius doesn't say anything about the mini bike. That they had to go back and shut Pius up.

"He said that—Peter then continued to tell his mother how he and these three other people drove back to the Dogwood Elementary School in search of John Pius. And how originally, how when they first got to that neighborhood they didn't see him. And how eventually, as they made a U-turn in the schoolyard and went through this cut-through, as Peter referred to it, in the bus circle, how it was that the headlights flashed across the front of the school building. And how when this occurred, how they saw John Pius pedaling his bicycle across the front of the school, headed towards the side.

"Q Did he indicate to you what occurred after they observed John Pius on the bicycle?

"A Yes. He went on to tell his mother that they stopped the car alongside the curb. That he and the three other people jumped out of the automobile. And that they had chased Pius around the side of the school building. And how it was that one of the other people caught up with Pius and knocked him off his bicycle to the ground. And how it was that one of the other people began telling Pius not to say anything about the mini bike.

"He continued, Peter that is, to tell his mother how Pius was saying, 'I didn't even recognize you guys.' How this other person is telling Pius that, 'We know you're going to rat us out,' in substance, 'about the mini bike.' And how Pius was saying, 'I don't care about any mini bike. I don't care what you guys are doing with the mini bike.'

"How this other guy—how Peter Quartararo was continuing to tell his mother how Pius is saying again that he didn't recognize anyone and how one of the other people was saying to John Pius, 'Bullshit.' That, 'You're going to rat us out.' And that how one of the other people for no reason then pushed Pius. And how they all began fighting with Pius. How it was

that he went on to explain to his mother how Pius was kicking and screaming and squirming. How it was that they're holding him down and how he continues to scream. And how one of the other people then said to Quartararo and the others, 'We got to shut him up.' And how he—the other people, other person then directs Peter and the other people to put rocks in his mouth to shut him up.

"Q Did Peter indicate what he was doing or where he was at this point?

"A Yes.

"Q What did he say?

"A Peter explained to his mother that his assistance in holding Pius down and putting the rocks in his mouth were that he, along with the others, were holding him down. But he particularly was sitting on his chest. And that he pried—Peter particularly pried his mouth open by holding his face with one hand and by reaching in—by reaching into the lip of his lower jaw and prying his mouth open with the other hand. And that upon doing so, they all put—Peter and the other people shoved rocks in John Pius' throat.

"Q Did he indicate to his mother what occurred after that?

"A Peter said that Pius had quit screaming and squirming and kicking. And that he and the other people realized that he was dead. And that he and the other people decided that they had to bury the body. That they had to hide the body. That there came a time when one of the other people directed one of the other people with Peter to take Pius' bicycle. And how it was that two of the remaining people started dragging John Pius by the feet along this dirt road, alongside of the school, towards the rear of the property. Peter indicated that he was following along.

"He further told his mother that there came a time when Pius wouldn't slide. That they got off the dirt onto a macadam blacktop play area behind the school and how Pius wouldn't slide. And how one of the other people asked Peter if he would help them carry John Pius.

"Peter then went on to say how the other people took the legs and shoulders of John Pius and how he grabbed him somewhere around the top of his thighs, around the lower waist area. And with that they carried him across this black-top piece of property.

"He went on to tell his mother how there came a time when they got to the rear of the schoolyard that they put Pius down

so as to rest, to take a break, as well as to decide where Peter and the other people were going to hide John Pius. They decided that they were going to put him down the hill in the woods behind the school property. More or less alongside of a path to the rear of the slides and swings which are on this playground area of this Dogwood School.

"Upon deciding that that's where they were going to put Pius, Peter went on to say how when they picked John Pius up, when he and the other people picked John Pius up to move him, how John Pius' wallet fell out of his pocket onto the ground. Peter went on to say then how one of the other people who had the bike, threw it up against the tree. And how they all dragged John Pius down the side of this hill into the woods. And how it was that they all—Peter and the other people—threw sticks, leaves and two logs on top of John Pius to hide the body.

"Q Did his mother say anything at this point?

"MR. POLIN [defendant's attorney]: Objection.

"THE COURT: Sustained.

"Q Just yes or no * * *

"A Yes she did.

"Q Did Peter say anything in response to that?

"A Yes, he did.

"Q What did he say?

"A That he didn't pick up the wallet when he noticed it fall out of the pocket as he really didn't—at that point didn't care about the wallet. That he was frightened. And that he just walked away from it and paid no mind to it.

"Q Did his mother ask him anything else without telling us? Just yes or no.

"A Yes, she did.

"Q And did Peter say anything in response?

"A Yes, she did—yes, he did.

"Q What did he say?

"A That it was the truth. That it happened just as he said it happened. That what he said was exactly what had occurred that night between himself and the other people".

Following Peter Quartararo's confession, his brother Michael was brought into the room. Although Peter Quartararo urged his brother to tell the police "everything", Michael did not do so.

Shortly thereafter, the detectives left the room and Mrs. Quartararo conferred with her sons. When the detectives returned to the room, they were informed by Peter Quartararo that his prior statement was a lie which was made solely in the hope that the police would let him go.

## B. The Defendant's Case

The defendant's case consisted solely of the testimony of three character witnesses and one Debra Ann D'Anderaia. Ms. D'Anderaia testified that on the evening of April 20, 1979, she was baking brownies at the Quartararo home in Smithtown. At approximately 8:45 P.M., the defendant, Peter and Michael Quartararo, and Ryan came into the house and sat down in the kitchen. Ms. D'Anderaia overheard the four boys talking about a minibike which they had apparently stolen from a house near the Dogwood School. The boys then went into the den and watched television for the rest of the evening. The defendant and Ryan left the Quartararo residence at approximately 11:30 P.M.

## C. Verdict and Sentence

The jury ultimately returned a verdict finding the defendant guilty of murder in the second degree and manslaughter in the first degree. The defendant was subsequently sentenced to concurrent sentences of 25 years to life and 8⅓ to 25 years' imprisonment.

### THE LAW

## A. Declaration Against Penal Interest

The People take the position on appeal that the introduction into evidence of Peter Quartararo's confession raises neither hearsay nor right-of-confrontation issues since the confession was not admitted for the truth of the matter asserted but rather for the limited purpose of rebutting an attack by the defense on the credibility of the prosecution's witnesses, particularly Brett Locke. We find this position to be devoid of merit. Although the trial court initially instructed the jury that Quartararo's confession was being introduced for the limited purpose of weighing the reliability and credibility of the other testimony and evidence presented, the court subsequently advised the jury that Quartararo's statement could be used "to corroborate the testimony of other witnesses in this case". Similarly, during his summation to the jury, the prosecutor made several remarks urging the jury to utilize Quartararo's confession as corroborative evidence of the defen-

dant's guilt. These comments, coupled with the court's instructions, clearly led the jury to believe that Quartararo's statement was being introduced as primary evidence of the defendant's guilt rather than for the limited purpose of weighing the credibility of other evidence and testimony.

In this respect, the case at bar is clearly distinguishable from *Tennessee v Street* (471 US 409) upon which the People rely. In *Street,* the prosecution introduced the unavailable declarant's statement *solely* for the nonhearsay purpose of rebutting the defendant's testimony that his confession had been coerced. Moreover, the jury in *Street* had been "pointedly instructed by the trial court 'not to consider the truthfulness of [the declarant's] statement in any way whatsoever' " *(Tennessee v Street, supra,* at pp 414-415). Here, however, Quartararo's confession was clearly offered as evidence of the defendant's guilt and the jury was instructed to utilize the confession as corroborative evidence of guilt.

New York has long recognized the declaration against interest exception to the hearsay rule, although prior to 1970 only those declarations which were against the maker's pecuniary or proprietary interest were deemed admissible under this hearsay exception. This rather arbitrary distinction was ultimately abolished in *People v Brown* (26 NY2d 88) in which the Court of Appeals adopted the rationale that " '[a] declaration against penal interest is no less trustworthy [than an admission against pecuniary interest] * * * a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest' " *(People v Brown, supra,* at p 92, quoting from *People v Spriggs,* 60 Cal 2d 868, 874, 389 P2d 377, 381). Thus, this hearsay exception is based upon the belief that a person would not knowingly make a declaration contrary to his or her own interest, whether pecuniary or penal, unless the declaration was true *(see,* Richardson, Evidence § 256 [Prince 10th ed]; *People v Maerling,* 46 NY2d 289, 295; *People v Shortridge,* 65 NY2d 309, 312).[4]

---

4. Numerous States have adopted codes of evidence which specifically permit the admission of declarations against penal interest *(see, e.g.,* Cal Evidence Code § 1230; Kan Stats Ann § 60-460 [j]; Nev Rev Stats § 51.345 [1] [b]; NJ Rules of Evidence, rule 63 [10]). Similarly, the Federal Rules of Evidence provide, *inter alia,* that "[t]he following are not excluded by the hearsay rule if the declarant is unavailable * * * A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal

The requirements for the admission into evidence of a declaration against penal interest were set forth by the Court of Appeals in *People v Settles* (46 NY2d 154, 167, *supra*), as follows: "[f]irst, the declarant must be unavailable as a witness at trial; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability".

The first several cases in which the Court of Appeals applied the declaration against penal interest exception were limited to situations in which the third-party's statement tended to exculpate the defendant *(see, People v Settles, supra; People v Brown, supra; see also, People v Shortridge, supra)*. However, in *People v Maerling (supra)*, the Court of Appeals for the first time approved, in principle, the admissibility of declarations against the maker's penal interest which tended to inculpate the defendant. The *Maerling* court commented, "we note immediately that the court's holding that the statement in *Brown* was admissible was not made to turn on the fact that it was offered for the defendant rather than against him, but on the unlikelihood, given the potentially serious consequences to the declarant of his revelation, that he would have admitted to the crime were it not true" *(People v Maerling, supra,* at p 297). The *Maerling* court emphasized, however, that statements of an incriminating nature must be subject to strict judicial scrutiny to insure their reliability, particularly in view of the potential motives on the part of the declarant to falsify in the hope of receiving immunity from prosecution in return for his or her testimony or of being allowed to plead guilty to a lesser charge. More significantly, the introduction of third-party statements which tended to incriminate the accused implicates the latter's rights under the confrontation clause of the 6th Amendment. Finally, the *Maerling* court cautioned that "since a statement may in part be disserving and in part self-serving, ideally courts should only admit that portion of an inculpatory statement which is

liability * * * that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement" (28 USC § 804 [b] [3]).

opposed to a declarant's interest" *(People v Maerling, supra,* at p 298).

In a recent case, *People v Geoghegan* (51 NY2d 45), the Court of Appeals determined that a custodial declaration against penal interest which tended to incriminate the defendant in a murder was inadmissible because the requirements of *People v Maerling (supra)* had not been met. In particular, the *Geoghegan* court noted that there was more than a distinct possibility that the declarant was motivated to falsely inculpate the defendant in the hope of winning immunity from prosecution or a plea to a reduced robbery charge. In that case, the declarant, who was already in custody and subject to criminal prosecution at the time of his statement, had demonstrated a significant degree of cooperation with the prosecution which indicated that he was seeking to achieve lenient treatment for himself. Moreover, the declarant, in his statement, implicated the defendant in performing the actual killing but limited his own participation "to the less culpable role of waiting with [another accomplice] while, without their knowledge, others accomplished the actual killing" *(People v Geoghegan, supra,* at p 49). In addition to the unreliability of the declaration, the *Geoghegan* court noted that the fact that the declaration "was not restricted to self-inculpation, but as well implicated defendant, deprive[d] it of admissibility under *Maerling" (People v Geoghegan, supra,* at p 49; *see also, People v Josan,* 92 AD2d 902 [declaration against penal interest inculpatory of the declarant was inadmissible because of the distinct possibility that the declarant was motivated to falsify]; *People v Trice,* 101 AD2d 581 [declarant's custodial statement inculpating the defendant in a murder, while only incriminating himself in the offense of smoking marihuana, was not sufficiently reliable to permit its admission as a declaration against penal interest]).

However, several other New York courts have permitted the use of incriminating declarations against penal interest against a defendant. For example, in *People v Egan* (78 AD2d 34), the Fourth Department, in an opinion authored by then Justice Simons, applied this hearsay exception to a case in which the defendant and her husband were accused of killing the defendant's former husband. The defendant and her husband were tried separately. At the defendant's trial, one Vic Vyverberg, who had assisted in the disposal of the victim's body, was permitted to testify as to statements made by the defendant's husband immediately following the killing which

implicated the defendant. The defendant's husband had invoked his 5th Amendment right against self-incrimination and refused to testify at the defendant's trial. Applying the elements of the declaration against penal interest hearsay exception, the *Egan* court determined that Vyverberg's testimony was admissible under this exception. The court also concluded that the introduction of this evidence did not violate the defendant's right of confrontation since considerations of the reliability of the evidence, the necessity of its use, as well as general due process principles, had been satisfied *(see also, People v Green,* 75 AD2d 502; *People v Scalise,* 70 AD2d 346; *People v Thomas,* 117 Misc 2d 1011; *People v H.,* 113 Misc 2d 611).

Applying the elements of the declaration against penal interest exception to the case at bar, we note at the outset that the first requirement of unavailability of the declarant was satisfied. By invoking his right against self-incrimination, Peter Quartararo clearly became unavailable to testify *(see, People v Settles,* 46 NY2d 154, 167-168, *supra; People v Brown,* 26 NY2d 88, 92, *supra).* Second, the circumstances surrounding his confession clearly indicate that Peter Quartararo was aware that his statement was against his penal interest. Prior to making his confession, Quartararo was specifically informed that all guilty parties involved in the Pius killing would be prosecuted. Moreover, given the gravity of the crime involved, it strains credibility to argue, as the defendant does, that Quartararo could have assumed that nothing would happen to him regardless of what he told the police about his participation in the Pius killing.

Third, Quartararo obviously had competent knowledge of the facts underlying his inculpatory statement in view of his admitted participation in the crime. Quartararo's familiarity with the circumstances of the killing is also reflected by the detailed nature of his statement concerning the events leading up to the youths' encounter with Pius and, most significantly, the description of the precise method in which the murder took place and the manner of disposal of the body. This point was highlighted by the trial court: "[Quartararo's] description of the manner in which, and the place where the body was left, matched in every detail with the description of how the body had been found on April 21, 1979 by a friend of the Pius family following an extensive search of the grounds of the Dogwood Elementary School. The friend, Joseph Sabina, Jr., had been expressly directed by the investigating detective not

to divulge the manner in which he had discovered the body, so that only he, the police, and the murderer would know [how] the boy [was] left" *(People v Brensic,* 118 Misc 2d 390, 392, *supra).*

Fourth, we find that Peter Quartararo's confession was sufficiently reliable to permit its introduction into evidence under this hearsay exception. Admittedly, the fact that Quartararo's incriminating statement was made in a custodial setting while he was being questioned by the investigating officers provides cause for careful judicial scrutiny on the issue of reliability since custodial confessions are "traditionally viewed as of suspect reliability insofar as the declarant attempts to shift or share the blame, for whatever reason" *(see, United States v Sarmiento-Perez,* 633 F2d 1092, 1096). However, we reject the defendant's contention that custodial declarations against penal interest are per se unreliable and inadmissible as an exception to the hearsay rule. Clearly, if the declarant is in custody at the time the declaration is made, careful consideration must be given to the issue of whether the statement was made voluntarily and without coercion, and whether potential motives to curry favor with the interrogating officers exist *(see, People v Geoghegan,* 51 NY2d 45, *supra; People v Trice,* 101 AD2d 581, 583, *supra; United States v Garris,* 616 F2d 626, 631-632, *cert denied* 447 US 926; *United States v Sarmiento-Perez, supra; United States v Palumbo,* 639 F2d 123, 127-128, *cert denied* 454 US 819; *United States v Riley,* 657 F2d 1377, 1384; *United States v Katsougrakis,* 715 F2d 769, 774-775, *cert denied* 464 US 1040). However, the custodial status of the declarant is but one factor to consider in determining the trustworthiness and reliability of the statement.

Here, there is no indication that Peter Quartararo's confession was the result of coercive or threatening tactics by the interrogating officers. In fact, this court, in the prior appeal by Peter Quartararo from his murder conviction, specifically rejected such a claim and held that his interrogation was not of such a nature as to require suppression of his statement *(see, People v Quartararo,* 113 AD2d 845, *supra).* Similarly, the existence of a potential motive on the part of Quartararo to falsify or curry favor with the interrogating officers is contraindicated by the fact that Quartararo implicated himself in the Pius murder to the same degree as his codefendants after being informed that all guilty parties would be subject to prosecution *(cf. People v Geoghegan, supra).* Additionally, as

the trial court noted, the presence of Quartararo's mother during questioning provides certain assurances as to the reliability of the confession since "once [Quartararo's] mother arrived to aid him, the 'obvious motives for falsification' no longer [were] paramount and it is reasonable to conclude that the statements forthcoming were reliable" *(People v Brensic,* 118 Misc 2d 390, 400, *supra).*

The reliability of Quartararo's statement is further buttressed by competent evidence in the record independent of the declaration itself. The testimony of O'Neil and Sparling concerning the events leading to Peter Quartararo's confrontation with Pius on the evening of April 20, 1979, the evidence relating to the discovery of Pius' wallet, Sabina's testimony regarding his observations upon his discovery of the body, the medical evidence concerning the cause of death and Locke's testimony concerning the defendant's jailhouse confession, all constituted independent factual proof which was highly corroborative of Peter Quartararo's confession *(see, People v Settles,* 46 NY2d 154, 168-170, *supra; People v Egan,* 78 AD2d 34, *supra).*

We also find that the content of Quartararo's confession as presented to the jury was sufficiently restricted to self-incriminating statements so as to satisfy the dictates of *People v Maerling* (46 NY2d 289, *supra).* The trial court deleted all references to the defendant and the other participants in the killing who were merely referred to, *inter alia,* as "the other people", "the others" or "they". Moreover, in view of the trial testimony which is replete with references to several youths, including O'Neil, Sparling, Ryan, and Michael Quartararo, who were in the vicinity of the schoolyard on the evening of the killing and who were, at least, initial suspects in the investigation of the murder, the redacted version of the confession did not necessarily inculpate the defendant as a participant in the crime *(cf. People v Wheeler,* 62 NY2d 867; *People v Smalls,* 55 NY2d 407; *People v Burrelle,* 21 NY2d 265). Finally, unlike *People v Lopez* (68 NY2d 683), and *People v Jackson* (22 NY2d 446), neither counsel, the witness, nor the Trial Judge made any "slip of the tongue" *(People v Lopez, supra,* p 685), by using the defendant's name when referring to the other participants in the killing contained in Peter Quartararo's redacted confession *(see also, People v Geoghegan,* 51 NY2d 45, 49, *supra).*

## B. Right of Confrontation

Having determined that Peter Quartararo's confession meets the requirements of the declaration against penal interest exception to the hearsay rule under *People v Settles (supra)* and *People v Maerling (supra),* we now address the issue of whether the defendant was deprived of his constitutional right of confrontation as a result of the introduction of Peter Quartararo's statement. Both the Federal and New York Constitutions guarantee an accused the right at trial to "be confronted with the witnesses against him" (US Const 6th Amend; NY Const, art I, § 6). The right to confront and cross-examine adverse witnesses seeks to foster "the perception as well as the reality of fairness" in the system of criminal justice *(Lee v Illinois,* 476 US —, —, 106 S Ct 2056, 2062). Moreover, the courts have consistently recognized that the truth-finding function of the right of confrontation is particularly threatened when a codefendant's confession implicating the defendant is admitted into evidence without the benefit of cross-examination. Thus, in *Bruton v United States* (391 US 123), the Supreme Court held inadmissible on confrontation grounds a confession made by the defendant's accomplice which implicated the defendant at a joint trial where the accomplice refused to testify. In addressing the issue of the admissibility of extrajudicial third-party statements inculpating the defendant, the *Bruton* court stated: "Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed" *(Bruton v United States, supra,* at p 136).

In post-*Bruton* cases, the Supreme Court has continually expressed the view that a rebuttable presumption of unreliability attaches to a codefendant's confession which tended to implicate the accused, thereby precluding its admission into evidence *(see, Lee v Illinois,* 476 US —, 106 S Ct 2056, *supra; Dutton v Evans,* 400 US 74; *California v Green,* 399 US 149; *Douglas v Alabama,* 380 US 415). In *Ohio v Roberts* (448 US 56), the Supreme Court, however, further explained that the presumption of unreliability may be rebutted and evidence admissible under an exception to the hearsay rule may be received into evidence without violating the confrontation

clause if two requirements are met. First, the declarant must be unavailable at trial. Second, the statement must bear sufficient indicia of reliability to " ' "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement" ' " in the absence of cross-examination *(Ohio v Roberts, supra,* at pp 65-66, quoting from *California v Green, supra,* at p 161). The *Roberts* court also stated that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness" *(Ohio v Roberts, supra,* at p 66).

■ Here, although the declaration against penal interest exception to the hearsay rule has long been recognized in this State, we decline to adopt a rule that every extrajudicial statement which falls within this hearsay exception may be admitted into evidence notwithstanding the accused's right of confrontation *(see, Lee v Illinois, supra,* at p —, n 5, p 2064, n 5). In any event, we conclude that, under the circumstances of this case, the admission into evidence of Peter Quartararo's confession did not violate the defendant's right of confrontation since the two requirements outlined in *Ohio v Roberts (supra)* were satisfied *(see, People v Sanders,* 56 NY2d 51, 64).

First, as noted previously, Peter Quartararo was "unavailable" to testify at the trial in view of the invocation of his right against self-incrimination. Second, the circumstances surrounding Quartararo's statement provided the trier of fact with sufficient "indicia of reliability" to permit a proper evaluation of the credibility of the confession without the aid of cross-examination. Quartararo's redacted confession, as discussed earlier, was highly corroborated by the independent evidence in the record. Moreover, Quartararo's statement, in which he implicated himself in the murder to the same degree as the defendant, was determined to have been given after he had knowingly and voluntarily waived his *Miranda* rights *(see, People v Quartararo,* 113 AD2d 845, *supra).*

It is also significant that in addition to satisfying the requirements of *Ohio v Roberts (supra),* the instant case falls within a well-recognized exception to the *Bruton* rule, to wit, the interlocking admissions exception. This exception provides that if the statements of the accused and the unavailable declarant are substantially identical, or "interlock", the defendant's right of confrontation is not violated *(see, People v Cruz,* 66 NY2d 61, 64, *cert granted* — US —, 106 S Ct 2888; *People v*

*McNeil,* 24 NY2d 550). The exception is based upon a recognition that if the two statements interlock, the codefendant's extrajudicial statement is no more inculpating than the defendant's own statement and thus negates the concern expressed in *Bruton* over the lack of confrontation *(see, People v Smalls,* 55 NY2d 407, 414-415; *People v McNeil, supra,* at p 553).

In order for the interlocking admissions exception to apply, the two statements must be substantially similar although they need not be identical *(see, People v Cruz, supra,* at p 70; *People v Smalls, supra,* at p 415). This point was recently addressed by the Court of Appeals in *People v Cruz (supra,* at p 70): "Statements are substantially similar when defendant's confession is close enough to the codefendant's with respect to the material facts of the crime charged to make the probability of prejudice so negligible that the end result would be the same without the codefendant's statement *(People v Berzups, supra,* at p 425; *People v Safian, supra,* at p 188; *see also, People v Fisher,* 249 NY 419, 426, *supra).* Confessions do not 'interlock', however, if a codefendant's confession may be used to fill material gaps in the necessary proof against defendant *(see, People v Smalls, supra; People v Burns,* 84 AD2d 845)". Significantly, the existence of differences in the reliability of the two statements does not preclude the application of the interlocking admissions exception. Thus, the fact that one statement is oral and the other written, that one was given to police officers and the other to lay witnesses or that one statement is short and the other long, does not affect the admissibility of the codefendant's "interlocking" extrajudicial statement *(see, People v Cruz, supra,* at p 72; *People v Woodward,* 50 NY2d 922; *Parker v Randolph,* 442 US 62). The application of the exception is not any different because the defendant or the declarant, as in this case, repudiates his or her confession or challenges its voluntariness *(see, People v Cruz, supra,* at p 72).

Applying the foregoing principles to the case at bar, it readily appears that the defendant's own jailhouse confession, as testified to by fellow inmate Brett Locke, interlocked with Peter Quartararo's confession, and thus the defendant's right of confrontation was not violated. A comparison of the content of the defendant's confession with Quartararo's establishes that the statements are substantially interlocking in that both describe in some detail, (1) the defendant's activities prior to the theft of the motorbike, (2) the theft of the motorbike, (3) the four youths' encounter with Pius, (4) the motive for the

killing, (5) the subsequent beating and suffocation of Pius, and (6) the disposal of the body. The only differences between the two confessions are in regard to their length and the fact that Quartararo's statement was given to police officers while the defendant's inculpatory statement was made to a fellow prison inmate. However, these differences in the two statements do not, as noted, previously, preclude the application of the interlocking admissions exception but rather involve questions of credibility. Moreover, the instant case, as *People v Cruz (supra)*, features significant independent evidence which corroborates the confessions and provides sufficient reliability. Thus, the confessions were not unreliable as a matter of law and the issue of how much weight is to be accorded the confessions was for the triers of fact to resolve.

Parenthetically, we note that the case at bar is factually distinguishable from the recent Supreme Court case of *Lee v Illinois* (476 US —, 106 S Ct 2056, *supra)* wherein the court held that the trial court's reliance upon a codefendant's confession as substantive evidence of guilt against the defendant Lee, in a joint trial, violated the latter's right of confrontation since the presumption of unreliability of the nontestifying codefendant's statement had not been overcome. In that case, Lee and her boyfriend, the codefendant Edwin Thomas, were accused of murdering Lee's aunt and her aunt's friend. Sometime after the murders, and before Lee and Thomas became suspects, Lee was requested to appear at the police precinct in order to identify a badly burned body which had been discovered in an apartment in the housing complex where she and her aunt resided. When Lee began to cry upon seeing the body, the detective advised Lee of her *Miranda* rights and questioned her as to the whereabouts of her Aunt Beedie. Lee eventually admitted that she and Thomas had killed her aunt and her aunt's friend, Odessa Harris. Following her confession, Lee was again advised of her *Miranda* rights and she signed a typewritten statement incorporating her confession.

Lee's statement indicated that she and Thomas were at Lee's apartment on the evening of February 11, 1982, when her Aunt Beedie and Odessa Harris arrived. The two women went into the bedroom and watched television. During the course of the evening, Lee and Thomas had "words" in the kitchen *(Lee v Illinois, supra,* at p —, p 2058). Harris came out of the bedroom and told them to stop fighting. After Harris returned to the bedroom, Lee called her back into the kitchen

in order to confirm that Aunt Beedie had paid the rent. Following their conversation, Harris turned to go back to the bedroom and as she passed Thomas, she gave him "dirty looks" *(Lee v Illinois, supra,* at p —, p 2058). At that point, Thomas stood up and stabbed Harris in the back with a 24-inch knife.

Lee then ran into the bedroom and found her Aunt Beedie sitting on the bed with a knife in her hand. The aunt arose from the bed, swung the knife at Lee and told her to get out of the way or she would kill her. Lee ran out into the kitchen, grabbed a butcher's knife, returned to the bedroom and stabbed her aunt to death.

Lee also indicated that she and Thomas had experienced difficulty with her aunt. Lee stated " '[m]e, and Edwin had talked about stop[p]ing aunt [Beedie] from harassing me before. She would come in drunk or would get on the phone and tell people that I never did anything for her and that I wouldn't give her anything to eat, or anything since I had a boyfriend * * * Things just kept adding up and adding up and the night that we killed [Harris] and my aunt [Beedie] Edwin just couldn't take anymore' " *(Lee v Illinois, supra,* at p —, p 2059).

While Lee was being questioned, Thomas arrived at the precinct. He was immediately advised of his *Miranda* rights and confronted by an officer about his alleged participation in the murders. Thomas stated that he " 'wanted to think about' whether to talk to the police" *(Lee v Illinois, supra,* at p —, p 2058).

During the course of her questioning by the police, Lee requested to see Thomas. After she signed her written statement, Lee met with Thomas and stated "[t]hey know about the whole thing, don't you love me Edwin, didn't you in fact say . . . that we wouldn't let one or the other take the rap alone" *(Lee v Illinois, supra,* at p —, p 2058). Thereafter, Thomas agreed to talk to the police and signed a written statement.

Thomas' statement was similar in some respects to Lee's confession insofar as it described his argument with Lee, the confrontation with Harris in the kitchen and the subsequent stabbings. Most importantly, however, Thomas' statement differed in that he indicated that he and Lee had previously spoken about killing Aunt Beedie and referred to conversations immediately prior to the stabbings which suggested a

premeditated plan to kill. Thomas stated that after Harris had told him and Lee to stop fighting:

" 'This is when I asked [Lee] "did she still want to go through with it?" I was referring to what we had plained *[sic]* before about killing Aunt Beedie. We had talked about doing something to Aunt Beedie, but we had not figure *[sic]* out just what we would do. We had never before discussed doing anything to Odessa just Aunt Beedie, because we were tired of Aunt Beedie getting drunk, and coming home and "going off" on [Lee] ... After asking [Lee], "did she still want to do it?" [Lee] first gave me a funny look, as though she was not going to do it, she stared into space for awhile, then she looked at me and said, "yes."

" 'We decided that if we did som[e]thing to Aunt Beedie, we had to do something with Odessa. We wanted Odessa to leave, but she stayed there. We had plained *[sic]* that [Lee] was supposed to get Odessa to stand, with her back toward the front room, looking into the kitchen, while I would grab her from the back, using the big knife' " *(Lee v Illinois, supra,* at p —, p 2059).

Lee and Thomas, both charged in a two-count indictment with murder, were tried together in a bench trial. Both statements were admitted into evidence and were relied upon heavily by the prosecution and the defendants. Lee's counsel argued that in order for a person to be guilty of murder under Illinois law, he or she must be involved during and after the commission of the offense and that Lee's statement could not be fairly read to support such a finding. With respect to Aunt Beedie's murder, Lee's counsel argued that the court should consider the lesser offense of voluntary manslaughter since according to Lee's statement, Lee was under the " 'unreasonable belief that [she was acting out of] * * * self-defense' or * * * that the killing 'was the result of a sudden and intense passion resulting from serious provocation' " *(Lee v Illinois, supra,* at p —, p 2060). The prosecution, however, argued that Lee's premeditated intent to kill her aunt and her facilitation in Harris' murder was well established by Thomas' statement.

The trial court, in finding Lee guilty of the two murders, expressly relied upon Thomas' confession and his version of the killings as substantive evidence of Lee's guilt. On appeal, Lee argued, *inter alia,* that her 6th Amendment right of confrontation had been violated by the trial court's reliance

upon Thomas' confession. The Appellate Court of Illinois, however, held that since the two statements were "interlocking" they did not fall within the rule of *Bruton v United States* (391 US 123, *supra),* and thus Lee's rights were not violated *(People v Lee,* 129 Ill App 3d 1167, 491 NE2d 1391).

The Supreme Court reversed Lee's murder convictions and remanded the case for a new trial on the basis that the trial court violated Lee's 6th Amendment rights by relying on Thomas' confession as substantive evidence of her guilt. In reaching its decision, the *Lee* court concluded that insufficient "indicia of reliability" of Thomas' confession existed in order to overcome the presumption of unreliability which attaches to a codefendant's confession *(Lee v Illinois,* 476 US —, —, 106 S Ct 2056, 2065). Particularly, the court noted that Thomas had originally refused to talk to the police about the murders when he arrived at the precinct. His "confession was elicited only after Thomas was told that Lee had already implicated him and only after he was implored by Lee to share 'the rap' with her" *(Lee v Illinois, supra,* at p —, p 2064). Additionally, the court stated: "It is worth noting that the record indicates that Thomas not only had a theoretical motive to distort the facts to Lee's detriment, but that he was actively considering the possibility of becoming her adversary: prior to trial, Thomas contemplated becoming a witness for the State against Lee" *(Lee v Illinois, supra,* at p —, p 2064).

The interlocking admissions exception to the *Bruton* rule was also deemed not to apply to that case. While the two statements overlapped to a great extent in their factual recitation, the *Lee* court emphasized that they differed with respect to Lee's involvement in the planning of her aunt's murder and in her facilitation of Harris' stabbing. Lee's confession did not in any way indicate that she and Thomas had a joint plan to murder Aunt Beedie or that she assisted in Harris' stabbing, whereas according to Thomas, Lee " 'was suppose *[sic]* to get [Harris] to stand, with her back toward the front room, looking into the kitchen' so that Thomas could stab her from the back" *(Lee v Illinois, supra,* àt p —, p 2065). The *Lee* court also noted that these discrepancies in the two statements could not be considered as "irrelevant or trivial" since they dealt with the crucial issues in dispute, namely, "the roles played by the two defendants in the killing of [Harris], and the question of premeditation in the killing of Aunt Beedie" *(Lee v Illinois, supra,* at p 2065).

In the case at bar, unlike *Lee (supra),* Peter Quartararo's

confession is supported by sufficient "indicia of reliability" to overcome the presumption of unreliability. The record is devoid of any evidence indicating that Quartararo was seeking to curry favor with the police by confessing to the murder and implicating the defendant. Additionally, Quartararo was not in any way coerced, subtly or otherwise, into confessing to Pius' murder, whereas in *Lee,* Thomas had been informed that Lee had already implicated him in the murders and Lee implored him to share "the rap" with her. Moreover, the trial record herein is replete with testimony and evidence which was highly corroborative of substantially all of the details of Quartararo's confession, thereby buttressing its reliability. Finally, while the interlocking admissions exception to the *Bruton* rule was deemed not to apply to *Lee,* given the divergences in the two statements on crucial issues in dispute at the trial, in the instant case, as explained, *supra,* Peter Quartararo's confession and the defendant's jailhouse statement to Locke, are compatible in essentially every respect. Any discrepancies in the two statements are either collateral to the crucial issues which were to be decided at trial or involved questions of credibility which were for the triers of fact to resolve.

## C. Proof of Guilt Beyond A Reasonable Doubt

The defendant next contends that the evidence against him fails to establish his guilt of manslaughter in the first degree and murder in the second degree beyond a reasonable doubt. We disagree.

"It is well established that the standard for reviewing the legal sufficiency of the evidence in a criminal case is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the defendant's guilt of the charged crimes had been proven beyond a reasonable doubt *(see, Jackson v Virginia,* 443 US 307, 319 * * * *People v Lewis,* 64 NY2d 1111, 1112 * * * *People v Malizia,* 62 NY2d 755, 757 * * * *People v Contes,* 60 NY2d 620, 621 * * *)" *(People v Bauer,* 113 AD2d 543, 548). Applying this standard of review to the case at bar, it is clear that the jury's verdict of guilt should not be disturbed.

We stress that the proof of guilt herein rested on both direct and circumstantial evidence. The direct evidence includes the detailed oral confession made by the defendant to Brett Locke and three separate admissions of guilt to friends. In addition, the circumstantial evidence corroborated the defendant's ad-

missions and confession by establishing that the victim, John Pius, left his home at approximately 8:15 P.M. on April 20, 1979, and headed towards the Dogwood School, which placed him on a collision course with the defendant and his three companions. Thus, the prosecution demonstrated the defendant's opportunity to kill Pius. Moreover, a motive for the killing was established by the evidence indicating that the defendant was riding a stolen motorbike in the schoolyard at approximately the same time that Pius arrived at the yard. Thus, it is reasonable to assume that the defendant was acting out of a belief that Pius would report the stolen motorbike, as was established by Peter Quartararo's confession. Finally, the evidence regarding the condition of the body upon its discovery by Sabina and the medical testimony concerning the cause of death were highly corroborative of the defendant's confession.

Clearly, the evidence herein, when viewed in a light most favorable to the prosecution, supports the jury's verdict of guilt of manslaughter in the first degree (Penal Law § 125.20 [1]) and murder in the second degree (Penal Law § 125.25 [2]) beyond a reasonable doubt.

## D. The Prosecutor's Summation

The defendant claims to have been denied a fair trial by reason of the prosecutor's summation remark which suggested that the defendant might have owned a pair of sneakers which would have matched the print impressions on the decedent's face, but discarded them to avoid being caught.[5] Although defense counsel registered an objection to the prosecution's remark, the trial court overruled the objection on the basis that it constituted fair comment.

■ While the prosecutor may have been somewhat overzealous in making the aforesaid suggestive comment, it is not the type of remark which was condemned in *People v Ashwal* (39 NY2d 105), since it constituted a fair reply to defense counsel's summation which characterized the prosecution's case as a "flim-flam sham; three shells and no pea". Moreover, defense counsel emphasized the fact that the prosecution never established that the defendant owned a pair of sneakers which

---

5. Consent to search forms were executed by the defendant and Peter and Michael Quartararo authorizing the search of their gym lockers. Although sneakers were found in the youths' lockers, the sneakers did not match the print impression on the decedent's face. No sneakers were obtained from the youths' homes.

matched either the prints on the decedent's face or the cast impressions taken from the area where the body was found.

In any event, even if we were to conclude that the prosecutor's closing remarks were improper, reversal of the judgment of conviction would not be warranted in view of the overwhelming proof of guilt *(see, People v Crimmins,* 36 NY2d 230; *People v Brosnan,* 32 NY2d 254, 262).

### E. The Jury Charge

The defendant claims that the trial court's charge on the element of intent unconstitutionally shifted the burden of proof to the defense in violation of the principles enunciated in *Sandstrom v Montana* (442 US 510) and *Francis v Franklin* (471 US 307, 105 S Ct 1965).

It is well established that a court, in charging the jury on the issue of intent, must inform the jury that the legal presumption that a person intends the ordinary consequences of his voluntary acts is a *permissive* presumption which the jury *may* draw if warranted by the facts *(see, Sandstrom v Montana, supra, Francis v Franklin, supra; People v Getch* 50 NY2d 456; *People v Green,* 50 NY2d 891, *cert denied* 449 US 957). The failure of the court to inform the jury of the permissive nature of the presumption of intent unconstitutionally shifts the burden of proof to the defendant and thus constitutes reversible error *(see, Sandstrom v Montana, supra,* at p 517).

In the case at bar, a review of the charge on the issue of intent establishes that the trial court charged that the presumption of intent was merely a permissive inference which the jury could draw if warranted by the facts. This point is well illustrated by the following excerpt from the trial court's charge:

"Intent is actually a state of mind. It is not visible or tangible. But its presence in or absence from the mind of a defendant must be determined by you from the evidence presented at the trial. Rarely does a person announce his intention to commit a crime. So that the presence or absence of intent are usually inferred from the acts or conduct of the defendant or from the circumstances surrounding such acts or conduct * * *

"So you can readily see that in determining the question of intent, you must consider all the evidence of the defendant's acts, his conduct and the circumstances surrounding such acts or conduct, in order to make your determination. *When con-*

*sidering the question of intent, you may infer, if you find that the evidence justifies such an inference, that a person intends the natural and probable consequences of his or her acts.* And unless the act was done under circumstances so as to preclude the existence of such intent, you have a right, *if the facts warrant such an inference, to infer the result produced.* That is, an intention to effect it. *However, I caution you, that this inference is merely permissive and not binding or conclusive. And you have a right to reject such inference if the facts do not warrant such a finding.*

"Lastly, I remind you that where intent is a necessary element of a crime, *the People have the burden of proving intent beyond a reasonable doubt"* (emphasis supplied).

The defendant's challenge to the propriety of the trial court's charge insofar as it concerned marshaling of the evidence is similarly without merit. Under CPL 300.10 (2), a trial court, in charging the jury, is required to "state the fundamental legal principles applicable to criminal cases in general" as well as "the material legal principles applicable to the particular case". Additionally, the court must "so far as practicable, explain the application of the law to the facts, but it need not marshall or refer to the evidence to any greater extent than is necessary for such explanation" (CPL 300.10 [2]). Marshaling of the evidence must be done fairly and must adequately set forth the respective positions of the parties *(see, People v Williamson,* 40 NY2d 1073). Moreover, the critical question on appellate review is whether the deficiency in marshaling the evidence, if any, was such as to deny the defendant a fair trial *(see, People v Culhane,* 45 NY2d 757, 758, *cert denied* 439 US 1047).

It is significant to note, at the outset, that the defendant never raised an objection to the court's marshaling of the evidence, and thus, has failed to preserve his argument for appellate review *(see, People v Harris,* 69 AD2d 843). In any event, the trial court's charge satisfied the dictates of CPL 300.10 (2), since the court marshaled the evidence and set forth the main points of both the prosecution and the defense cases in an evenhanded manner and without showing favoritism to either side.

■ Lastly, we find no error in the trial court's refusal to charge either manslaughter in the second degree (Penal Law § 125.15 [1]) as a lesser included offense under the first count of the indictment, charging him with intentional murder

(Penal Law § 125.25 [1]),[6] or criminally negligent homicide (Penal Law § 125.10) as a lesser included offense of either intentional murder or depraved indifference murder (Penal Law § 125.25 [2]). No reasonable view of the evidence would support a finding that the defendant committed these lesser included offenses but not those of which he stands convicted (see, People v Glover, 57 NY2d 61; People v Green, 56 NY2d 427).

*F. Alleged Inconsistent Verdicts*

■ Finally, the defendant contends that the jury verdict herein is internally inconsistent insofar as it found recklessness with respect to the depraved indifference murder conviction (Penal Law § 125.25 [2]) and intent to cause serious physical injury with respect to the first degree manslaughter conviction (Penal Law § 125.20 [1]). It is also argued that the two murder counts should have been submitted to the jury in the alternative. We disagree.

In the first instance, the defendant has failed to preserve this issue for appellate review since no objection was registered concerning the verdict's alleged inconsistency prior to the discharge of the jury (see, People v Alfaro, 66 NY2d 985; People v Satloff, 56 NY2d 745; People v Stahl, 53 NY2d 1048), nor did the defendant request that the trial court charge the two indictment counts to the jury in the alternative (cf. People v Gallagher, 116 AD2d 299). In any event, in view of this court's holding in People v Gallagher (supra), we do not view the instant verdicts as being inherently inconsistent. In Gallagher, the majority addressed a similar argument as follows: "The defendant argues that one who acts intentionally, i.e., with the conscious objective of bringing about a particular result, cannot, simultaneously act recklessly, i.e., with conscious disregard of a substantial and unjustifiable risk that such result will occur (see, People v Green, [56 NY2d 427,] 439 [dissenting opn of Gabrielli, J.], [rearg denied 57 NY2d 775]; see also, 1 CJI [NY] 14.02, at 733-734). Nevertheless, the Court of Appeals has considered and rejected that argument, holding, as a matter of law, that where two crimes require the same act and result and differ only as to the required mental state, it is impossible to commit the crime requiring the higher culpable mental state without concomitantly commit-

6. The trial court did charge manslaughter in the second degree as a lesser included offense of the second count of the indictment, charging him with depraved indifference murder (Penal Law § 125.25 [2]).

ting the lesser crime *(People v Green, supra; People v Perez,* 45 NY2d 204, 209-210; *People v Stanfield, supra).* Thus, we find nothing inherently self-contradictory in the jury's verdict in this case, by which the defendant was found guilty of both intentional murder and reckless manslaughter. Simply put, the finding of guilt as to one of the two counts does not exclude the same finding as to the other. Therefore, the defendant's repugnancy or inherent inconsistency claim must fail" *(People v Gallagher, supra,* at pp 302-303). The *Gallagher* court similarly rejected the defendant's contention that the two counts of murder charged in the indictment, i.e., intentional murder (Penal Law § 125.25 [1]) and depraved indifference murder (Penal Law § 125.25 [2]) should have been submitted only in the alternative. The court held: "The two counts were 'non-inclusory concurrent counts'. They were 'concurrent counts' (CPL 300.30 [3]), because both offenses were alleged to have been committed through a single act (the shooting of the victim) and, therefore, any sentences which might have been imposed thereon would necessarily have to be concurrent *(see,* Penal Law § 70.25 [2]). However, the two counts were 'non-inclusory', in that both counts charged crimes of the same degree, murder in the second degree, but each crime required proof of an element not essential to the other and hence, neither was a lesser included offense of the other (CPL 300.30 [4]; 1.20 [37]; *cf. People v Register,* 60 NY2d 270, *cert denied* 466 US 953). Since there was no mandatory requirement that the two counts of the indictment be submitted to the jury in the alternative, we find that the trial court did not abuse its discretion, as a matter of law, by submitting both counts to the jury with instructions that it return a separate verdict as to each (CPL 300.40 [3] [a])" *(People v Gallagher, supra,* at p 302).

### CONCLUSION

Having reviewed the defendant's principal arguments outlined above, as well as his remaining contentions, we conclude that affirmance of the judgment of conviction is warranted. The introduction of Peter Quartararo's custodial confession under the declaration against penal interest exception to the hearsay rule was clearly proper since the requirements of both *People v Settles* (46 NY2d 154, *supra)* and *People v Maerling* (46 NY2d 289, *supra)* had been satisfied. Concomitantly, the defendant's 6th Amendment right of confrontation was not violated by the admission of Quartararo's statement

since the presumption of unreliability which attaches to an accomplice's extrajudicial statement had been overcome herein *(see, Ohio v Roberts,* 448 US 56, *supra).* Additionally, Quartararo's confession clearly fell within the ambit of the interlocking confessions exception to the *Bruton* rule *(see, Bruton v United States,* 391 US 123, *supra).* Finally, the proof of the defendant's guilt of the charged crimes is overwhelming. We have reviewed the defendant's remaining contentions, and find them to be without merit.

Accordingly, the judgment appealed from should be affirmed.

MANGANO, LAWRENCE and KOOPER, JJ., concur.

Judgment of the County Court, Suffolk County, rendered May 23, 1983, affirmed.