Thomas RYAN, Petitioner–Appellant,

v.

David H. MILLER, Superintendent, Eastern Correctional Facility, Respondent–Appellee.

Docket No. 01–2122.

United States Court of Appeals, Second Circuit.

Argued: Feb. 8, 2002.

Decided: Aug. 28, 2002.

**234**

Lawrence O. Kamin, Willkie Farr & Gallagher (Steven M. Monroe, Marsh & McLennan Companies, and Henry J. Kennedy, Willkie Farr & Gallagher, on the brief), New York, NY, for Petitioner–Appellant Thomas Ryan.

Steven A. Hovani, Assistant District Attorney (James M. Catterson, Jr., District Attorney of Suffolk County, on the brief), Riverhead, NY, for Respondent–Appellee David Miller.

Before POOLER and SOTOMAYOR, Circuit Judges, and GARAUFIS, District Judge *.

POOLER, Circuit Judge.

Petitioner–Appellant Thomas Ryan appeals from the January 26, 2001, memorandum and order of the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge* ), denying his application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. A panel of this Court granted Ryan a certificate of appealability on August 28, 2001, on the sole issue of "whether, under the applicable standard of review, appellant is entitled to habeas relief on his claim that his right to confrontation under the Sixth Amendment was violated because the trial court permitted hearsay testimony of police witnesses Richard Jensen and Richard Reck which may have contained an implicit accusation." We find that the officers' testimony constituted hearsay containing an implicit accusation against Ryan, in violation of the Confrontation Clause of the Sixth Amendment, and that the state appellate court unreasonably applied clearly established Supreme Court precedent in denying Ryan's Sixth Amendment claim. Because we find that the error was not harmless, we reverse and remand for the granting of the writ.

**Background**

*The Underlying Crime.*

On April 20, 1979, John Pius, a thirteen-year-old boy from Smithtown, New York, left his father's house on his bicycle around 8:15 p.m. Approximately fifteen minutes later, a neighborhood girl saw him riding his bicycle toward Dogwood Elementary School. Pius never returned home. A

* The Honorable Nicholas G. Garaufis, United States District Court Judge for the Eastern District of New York, sitting by designation.

member of an informal search party found his dead body at 1 p.m. the next day, nearly sixteen and one half hours after Pius was last seen, in the woods behind the elementary school. Pius died after attackers beat him, dragged him, and shoved dirt and rocks down his throat, which ultimately suffocated him. Sergeant Richard Jensen, who joined the Homicide Squad of the Suffolk County Police Department on April 24, 1979, just four days after Pius's death, supervised the investigation. Police eventually charged four boys, also teenage residents of Smithtown, New York, in Pius's death: Michael Quartararo ("Michael Q."); Peter Quartararo, ("Peter Q."), the brother of Michael Q.; Robert Brensic; and Thomas Ryan, the petitioner-appellant. The crime achieved immediate notoriety in the small Long Island community and resulted in multiple trials and retrials of each of the four boys.

*The Police Investigation.*

Police focused their initial investigation on several local teenage boys—none of whom were ultimately charged—including John Sparling and Michael O'Neill. In the days immediately following the discovery of Pius's body, between April 22 and 24, 1979, Detective Richard Reck and Detective Gill questioned O'Neill and Sparling several times, once interrogating O'Neill for a period of several hours at the precinct. In addition, Jensen ordered his officers to keep O'Neill under police surveillance. Reck eventually learned that O'Neill was in the vicinity of Dogwood Elementary School on the night of April 20th. At some point, O'Neill told Reck that he saw Ryan and Brensic near the school on the night in question. Police initially directed their attention to Ryan,

Brensic, and the Quartararo brothers as a result of this information.

In an effort to investigate the activities of Sparling and O'Neill, the police first approached Ryan, Brensic, and the Quartararo brothers on April 25, 1979. Reck explained that they sought to question the boys as potential witnesses to the crime. Specifically, Reck testified, "We asked them if they knew John Pius. We asked them if they knew Michael O'Neill and John Sparling, and we asked them their whereabouts on the night of the murder of the Pius boy." Apparently, one of the four boys told the officers that on April 20 they were watching a baseball game at Smithtown East High School. Reck testified that Ryan responded affirmatively when the police asked if he had been at the high school that night. As part of the continuing investigation, Reck later discovered that Smithtown East High School's baseball field did not have night lights.

On April 28, 1979, in the course of surveilling O'Neill, police again encountered Ryan and Peter Q. Jensen requested that the two boys come to the precinct for questioning as potential witnesses in the John Pius murder, and the boys agreed. Upon arriving at the precinct, Jensen directed the boys to separate rooms of the same precinct complex for interviews. Reck interviewed Ryan, and Detective Palumbo interviewed Peter Q.[1] (We present Peter Q.'s interview and confession in the next section.) At the start of Reck's interview with Ryan, Reck explained that he wanted to talk to Ryan as a potential witness and that he wanted to talk to him about O'Neill and Sparling. Reck initially focused his questions to Ryan on O'Neill's and Sparling's relationship with Pius and

---

1. Initially, Detectives Palumbo and Leonard interviewed Peter Q., and Detectives Reck and Gill interviewed Ryan. Jensen eventually directed Gill to interview Brensic. However, Detective Palumbo interviewed Peter Q. for the entire time, and Detective Reck interviewed Ryan for the entire time.

Ryan's knowledge of their activities on the night in question. The record suggests that Reck did not consider Ryan a suspect at this point in time, and Reck testified that he thought "Thomas Ryan was covering up for O'Neill."

Early in the interview, Ryan again told Reck that he was at Smithtown East High School watching a baseball game on the 20th.[2] After Reck informed Ryan that O'Neill had told police that he had seen Ryan driving his car near the elementary school on the night of the 20th, and that Ryan was towing Brensic, who was on a minibike, Ryan changed his story and admitted they were at the elementary school. Ryan explained to Reck that he and the other three boys had stolen a minibike, which is why they lied about where they were that night. Ryan eventually added the detail that John Pius saw them with the stolen minibike. After Reck confronted Ryan with confessions and inculpations made by Peter Q., and after Reck read Ryan his rights on the charge of murder, Ryan added that the boys drove to the school in search of Pius, hoping to "shut him up" about the bike, but they never found him. In addition, Reck testified that, during the course of the interrogation, Ryan asked him, " 'What would happen to the kids that killed John Pius?' " Reck replied, " 'What do you mean kids? . . . Why do you say more than one?' " and Ryan responded, " 'That's just the way I worded it.' " Throughout the evening,

Ryan consistently denied killing Pius or having any knowledge about the attack.

Although Reck read Ryan his *Miranda* rights on the charge of the murder of John Pius, the police released Ryan from custody later that night.[3] They continued to consider him a suspect and focused much of their investigation on him until they arrested him two and one half years later, on October 23, 1981.

*Peter Q.'s Confession.*

On April 28, 1979, as Reck and Gill questioned Ryan, Detectives Palumbo and Leonard interviewed Peter Q., in a separate interrogation room of the same precinct. During the course of his interview/interrogation, Peter Q. confessed several times, to several different versions of the murder. All of his confessions implicated Ryan and Brensic, although in different ways, and only some of his confessions implicated his brother, Michael Q., and himself. *See Quartararo v. Mantello*, 715 F.Supp. 449, 454–56 (E.D.N.Y.), *aff'd*, 888 F.2d 126 (2d Cir.1989).

For reasons that we explain below, neither side introduced into evidence Peter Q.'s actual confession. However, we present an overview of the confession here to provide context. After initially denying involvement in or knowledge of the murder, Peter Q. first told Palumbo that Ryan and Brensic killed Pius because they thought Pius saw the four boys with the stolen minibike. *See People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d

---

**2.** At this point, Jensen directed two of his detectives to find Brensic, apparently to verify Ryan's story. After the police brought Brensic to the precinct, Detective Gill interviewed him.

**3.** Respondent argues that the police did not really arrest Ryan on the evening of April 28, 1979, because they initially brought him to the station for a witness interview, not for a suspect interrogation, and because they did

not officially charge him that night. However, this misstates the trial testimony. The witnesses testified that Reck read Ryan his rights and told him that they were charging him with the murder of John Pius. Further, they held him in conditions of custodial interrogations and questioned him as a suspect. Thus, although the police did not formally arrest Ryan that evening, the effect was the same for the purposes of our analysis.

1226, 1230, *remittitur amended by* 70 N.Y.2d 722, 519 N.Y.S.2d 641, 513 N.E.2d 1302 (N.Y.1987). Peter Q. denied any involvement by his brother, Michael Q., or himself. *See id.* Eventually, Peter Q. told Palumbo that his brother and he observed the attack but did not participate in it. *See id.* Finally, Peter Q. offered a third version of the murder in which all four boys participated. *See id.* After Peter Q. made this confession, the police brought Michael Q. to the precinct for questioning as well.

Both the New York Court of Appeals, in 1987, and the Eastern District of New York, in a 1989 decision affirmed by the Second Circuit, have held that Peter Q.'s confession was improperly obtained, unreliable as a matter of federal law, and inadmissible as evidence of guilt. *See Quartararo,* 715 F.Supp. at 455; *Brensic,* 517 N.Y.S.2d 120, 509 N.E.2d at 1233 ("Given this substantial evidence that the confession was but one of several, each containing material differences, that it was obtained from a juvenile after lengthy custodial questioning and that it was given under circumstances which suggest that it was induced by the hope of leniency, the confession should not have been placed before this jury as evidence of defendant's guilt."). Both courts found that the police employed illegal and coercive methods to induce Peter Q., an unrepresented, inexperienced, and confused juvenile, to give numerous inconsistent and unreliable confessions. *See Quartararo,* 715 F.Supp. at 456–65; *Brensic,* 517 N.Y.S.2d 120, 509 N.E.2d at 1229–33. The Eastern District opinion described in detail the manner and length of questioning and decried the resulting confessions as involuntary, inconsistent, coerced, and the product of lying and oppressive tactics by the police. Specifically, the court found that, "Palumbo admitted that he deliberately lied to [Peter Q.]," and that Pa-

lumbo's lies "induced [Peter Q.] to confess." *Quartararo,* 715 F.Supp. at 455. The district court also placed great weight on Palumbo's "patent and deliberate failure to follow the procedure mandated by the Supreme Court in *Miranda v. Arizona.*" *Id.* at 456. In addition, the court found that "[Peter Q.], a juvenile who had no prior experience with the criminal process, was subjected to lengthy incommunicado interrogation in violation of New York law," and noted that the failure to give *Miranda* warnings was "only one of a number of factors that lead to the conclusion that the defendant's confession was a product of the kind of interrogation that offends the Due Process Clause." *Id.* at 458.

The court ultimately concluded that Peter Q.'s first "confession was obtained in violation of 'the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness,'" *id.* at 461 (quoting *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)), and that the second confession "was the result of 'deliberate means calculated to break the suspect's will,'" *id.* at 462 (quoting *Oregon v. Elstad,* 470 U.S. 298, 312, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). With respect to all the confessions, the Eastern District found: "The Suffolk County Police here deliberately violated the Constitution of the United States and the laws of the State of New York to obtain a confession." *Id.* at 466. It is the unreliable confession of Peter Q., with its varying accusations against the other three boys, and the People's insistence on attempting to introduce it, in some form, that has caused the many reversals, mistrials, retrials, and grants of the writ of habeas corpus that have occurred in the cases of these four accused.

\* \* \* \* \* \*

The police investigation never uncovered any physical evidence connecting any of the accused to the crime. Following the New York Court of Appeals' and the Eastern District's decisions, Peter Q.'s confession was inadmissible at all the retrials. Therefore, the People presented mainly testimonial and circumstantial evidence at the trials. We begin by presenting the procedural histories of the case as it relates to each of the accused individuals.

*Procedural History of the Other Accused.*

In 1981, a jury convicted Peter Q. of murder, following a joint trial with his brother. *See People v. Quartararo,* 113 A.D.2d 845, 493 N.Y.S.2d 511 (N.Y.App. Div.1985). The Appellate Division affirmed Peter Q.'s conviction on appeal, *see id.,* and the Court of Appeals (Wachtler, *C.J.*) denied leave to appeal, *see People v. Quartararo,* 66 N.Y.2d 921, 498 N.Y.S.2d 1036, 489 N.E.2d 781 (N.Y.1985), both in 1985. In 1989, the Eastern District granted Peter Q.'s petition for a writ of habeas corpus, *see Quartararo v. Mantello,* 715 F.Supp. 449 (E.D.N.Y.1989), and the Second Circuit affirmed, *Quartararo v. Mantello,* 888 F.2d 126 (2d Cir.1989). The court granted the writ based on a finding that all of Peter Q.'s confessions on the evening of April 28, 1979, considered separately or together, were involuntarily made and obtained in clear violation of *Miranda,* violated a state law requiring extra procedural measures when questioning minors, resulted from coercive police tactics and lies, and violated the Due Process Clause. *See Quartararo,* 715 F.Supp. at 456–66 & n. 5. The court concluded that Peter Q.'s confessions were unreliable as a matter of federal law. *See id.* at 466. The People never retried Peter Q., and he is no longer in custody. It is Peter Q.'s unreliable confession that is the fulcrum of the case before us and of several other cases as well.

The same jury that convicted Peter Q. found Michael Q. guilty of murder following a joint trial with Peter Q. *See People v. Quartararo,* 113 A.D.2d 845, 493 N.Y.S.2d 511 (N.Y.App.Div.1985). The Appellate Division affirmed Michael Q.'s conviction on appeal, *see id.,* and the Court of Appeals denied leave to appeal, *see People v. Quartararo,* 66 N.Y.2d 921, 498 N.Y.S.2d 1036, 489 N.E.2d 781 (N.Y.1985) (Wachtler, *C.J.*). In 1988, the Eastern District granted Michael Q.'s petition for a writ of habeas corpus on grounds of ineffective assistance of counsel based, in part, on his counsel's failure to object to highly prejudicial evidence, *see Quartararo v. Fogg,* 679 F.Supp. 212, 223 (E.D.N.Y.1988), and the Second Circuit affirmed, *see Quartararo v. Fogg,* 849 F.2d 1467 (2d Cir.1988). In 1990, the People tried Michael Q. a second time, and a jury again convicted Michael Q. of second degree murder. *See People v. Quartararo,* 200 A.D.2d 160, 612 N.Y.S.2d 635 (N.Y.App.Div.1994). The Appellate Division affirmed the conviction on appeal, *see id.,* and the Court of Appeals (Simons, *J.*) denied leave to appeal, *People v. Quartararo,* 84 N.Y.2d 939, 621 N.Y.S.2d 536, 645 N.E.2d 1236 (N.Y.1994). On November 30, 1998, the Eastern District granted Michael Q.'s petition for a writ of habeas corpus based on insufficiency of the evidence, *see Quartararo v. Hanslmaier,* 28 F.Supp.2d 749, 779 (E.D.N.Y. 1998), but the Second Circuit vacated the judgment in 1999, *see Quartararo v. Hanslmaier,* 186 F.3d 91 (2d Cir.1999). The Supreme Court denied Michael Q.'s petition for a writ of certiorari in 2000. *See Quartararo v. Hanslmaier,* 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000). Michael Q. remains in custody.

Robert Brensic was convicted of murder in 1983, after a first trial ended in mistrial. *See People v. Brensic,* 119 A.D.2d 281, 284 & n. 2, 506 N.Y.S.2d 570 (N.Y.App.Div.

1986). The Appellate Division affirmed his conviction on appeal. *See id.* The New York Court of Appeals granted leave to appeal, *see People v. Brensic,* 69 N.Y.2d 719, 512 N.Y.S.2d 1046, 504 N.E.2d 414 (N.Y.1986), and reversed Brensic's conviction in 1987. *See People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226, *remittitur amended by* 70 N.Y.2d 722, 519 N.Y.S.2d 641, 513 N.E.2d 1302 (N.Y.1987). The basis of the reversal was the Court of Appeals' ruling that the circumstances of Peter Q.'s confession made it "unreliable as a matter of law." *Id.* at 1231. The court concluded that since the confession was unreliable, it could not satisfy the necessary elements of a statement against penal interest by an unavailable witness sufficient to qualify as an exception to the hearsay prohibition and should not have been received in evidence.[4] *See id.* After receiving a change of venue, *see People v. Brensic,* 136 A.D.2d 169, 177, 526 N.Y.S.2d 968 (N.Y.App.Div.1988) (per curiam), Brensic pleaded guilty to manslaughter in the second degree, and, as part of his plea agreement, he was paroled immediately, in 1988. Brensic remains on parole today.

*Procedural History of Thomas Ryan.*

Ryan's first trial in Suffolk County Court resulted in his conviction on two counts of murder in the second degree in 1983. *See People v. Ryan,* 121 A.D.2d 34, 54, 509 N.Y.S.2d 545 (N.Y.App.Div.1986). The Appellate Division, Second Department, affirmed the convictions, *see id.,* and the United States Supreme Court denied Ryan's petition for a writ of certiorari, *see*

*Ryan v. New York,* 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987). After reargument, the Appellate Division vacated its prior decision and overturned Ryan's conviction based on the admission of Peter Q.'s confession, which had been found to be involuntary and unreliable by the Court of Appeals. *See People v. Ryan,* 134 A.D.2d 300, 520 N.Y.S.2d 528 (N.Y.App. Div.1987) (following *People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (N.Y.1987)).

The People tried Ryan a second time, and that attempt ended in a mistrial on June 12, 1989, during the course of the People's case. The illegal confession was again the grounds—a government witness testified that he had reviewed Peter Q.'s confession in preparation for his testimony.

Ryan's third trial resulted in a conviction for one count of murder in the second degree in May 1990.

The mistrial and the third trial both occurred after the New York Court of Appeals and the Eastern District held Peter Q.'s confession was tainted. That holding set the stage for the government's attempt to circumvent the Confrontation Clause. It is the conviction resulting from Ryan's third trial that forms the basis of the appeal before us.

*Ryan's Trial Below.*

At Ryan's third trial, the People presented testimony from numerous police officers who investigated the Pius murder, a number of witnesses who saw or heard the four boys the night of the attack, an ex-

---

**4.** The Court of Appeals' opinion reversing Brensic's conviction did not consider his Confrontation Clause challenge, which was similar to the challenge Ryan raises here. In fact, although all of the previous opinions involving the cases of the four boys that granted relief did so based on the introduction of Peter Q.'s unreliable confession, none of the

opinions found a violation of the Confrontation Clause, and only one of them even considered the issue, and then only briefly. *See Quartararo,* 186 F.3d at 97–99 (reversing the district court's granting of the writ but affirming the district court's analysis rejecting a Confrontation Clause challenge).

girlfriend of Ryan's to whom Ryan made some arguably inculpatory statements, and the victim's father. In addition, the People elicited a number of statements that Ryan made after the police confronted him with Peter Q.'s confession, as well as statements Ryan made after his arrest, as evidence of consciousness of guilt. The People did not present any physical or direct evidence connecting Ryan to the crime.

Because of the previous two trials in this case, as well as the multiple trials in the cases of the three others boys, the trial court and the attorneys in Ryan's case were well aware that Peter Q.'s confession was inadmissible as direct evidence of guilt. However, the assistant district attorney and the defense attorney hotly contested the admissibility of the circumstances surrounding Peter Q.'s confession, that is, the actions of various officers in response to Peter Q.'s confession, as well as the statements Ryan made in response to Peter Q.'s confession. The lawyers' arguments concerning admissibility of these sequelae of Peter Q.'s confession were the subject of extensive sidebars and court consideration throughout the trial. The People wanted to offer into evidence testimony concerning the officers' and Ryan's reactions to Peter Q.'s confession and accusation, and the defense wanted to prohibit such testimony on the grounds that it made obvious that Peter Q. confessed and accused Ryan, effectively circumventing the Confrontation Clause with hearsay testimony. Specifically, the People wanted to offer into evidence testimony of what Jensen and Reck did upon hearing Peter Q.'s confession—charge Ryan—and Ryan's reactions and statements upon hearing Reck tell him that Peter Q. confessed and implicated Ryan. The defense fought against the admission of this testimony, arguing it constituted hearsay and contained an implicit accusation, thus violating the Confrontation Clause. Ultimately, the court allowed testimony that was designed to elicit the officers' reactions to Peter Q.'s confession without actually allowing direct testimony that Peter Q. confessed. In essence, the court allowed testimony about various people's reactions to an event without testimony as to what the event was. This appeal addresses whether the court's rulings allowing this testimony violated the Confrontation Clause.

*The Trial Testimony.*

The trial testimony of Jensen and Reck established the following facts: on the afternoon of April 28, 1979, Palumbo questioned Peter Q.; simultaneously, Reck questioned Ryan; during the course of questioning Peter Q., Palumbo spoke with Jensen; as a result of speaking with Palumbo, Jensen then directed Reck to advise Ryan of his rights as to the charge of murder; Reck advised Ryan of his rights; and as a result of Reck's statements to Ryan, Ryan offered some inconsistent and potentially incriminating statements. Ryan argues that this testimony made clear the following facts: Peter Q. confessed to Palumbo; Peter Q.'s confession implicated Ryan; Palumbo told Jensen of Peter Q.'s confession; upon hearing Peter Q.'s confession, Jensen informed Reck of Peter Q.'s confession and told him to charge Ryan with murder and read him his rights; and when Reck read Ryan his rights and told him of Peter Q.'s confession, Ryan made some inconsistent and potentially incriminating statements in response. Ryan argues that the obvious and direct link of Palumbo–Jensen–Reck, to which Jensen and Reck testified, provided the indirect link between Peter Q.'s confession and the arrest of Ryan and contained an obvious accusation against Ryan. Based on the testimony, the jury, according to Ryan, had nothing to conclude except that Peter Q. implicated Ryan. Because Peter

Q. did not testify, Ryan could not confront his accuser.

Because the exact content of the trial testimony is crucial, we spend some time presenting the relevant testimony, as well as the manner in which the People elicited that testimony.

*Sergeant Jensen's Testimony.*

During the crucial questioning on April 28, 1979, Sergeant Jensen was in charge of the investigation, and he acted as the hub of a wheel, with all of the investigators reporting to him. Jensen testified that he asked Ryan and Peter Q. to come to the police station as potential witnesses to answer questions about John Pius. After stating that Detectives Palumbo and Leonard were interviewing Peter Q. and that Detectives Reck and Gill were interviewing Ryan, Jensen testified to the following:

Q: "3 o'clock, did you have a conversation with somebody?"

A: "Yes, I did."

Q: "Who?"

A: "With Detective Reck."

Q: "Did you then have a conversation with someone else?"

A: "Yes."

Q: "Who?"

A: "Detectives Fountain and LaValle."

Q: "What about Detective Palumbo, where was he at that point?"

A: *"Detective Palumbo was still interviewing Peter Quartararo."*

Trial Tr. at 1702–03 (emphasis added).

Then Jensen testified that he sent Detectives LaValle and Fountain to find Brensic and bring him to the police station, which they did, and that Detective Gill questioned Brensic. Jensen then continued his testimony as follows:

Q: "And did something happen at 4:30?"

A: "Yes, there did."

Q: "What?"

A: "I received a phone call from Detective Palumbo."

Q: "Did you then have a conversation with Detective Palumbo on the telephone at about 4:30?"

A: "Yes, I did."

Q: *"Now, as a result of talking with Detective Palumbo at 4:30, did you do something with respect to Gill and Reck?"*

A: *"Yes, I did."*

Q: *"What was that?"*

A: *"I directed Gill and Reck to advise Tom Ryan and Robert Brensic of their rights."*

Mr. Hochbaum: "I'm going to object."

The court: "No, overruled."

Q: *"As to what charge?"*

A: *"Murder."*

Trial Tr. at 1705–06 (emphasis added). Thus, Jensen's testimony established that (1) Reck interrogated Ryan; (2) Palumbo simultaneously interrogated Peter Q; and (3) after Palumbo told Jensen what Peter Q. said, Jensen told Reck to read Ryan his rights as to the charge of murder. Directly following that testimony, Jensen continued on to state that he again spoke with Palumbo, and his testimony clarified that Palumbo was still interviewing Peter Q.:

Q: "After directing Gill and Reck to do that, did you go some place?"

A: "Yes, I did."

Q: "Where?"

A: "I went to the Fourth Precinct Juvenile Room."

Q: "And what did you do over there?"

A: "I had a conversation with Detective Palumbo."

Q: "For how long did you converse with Detective Palumbo at that time?"

A: "For several minutes—maybe 15, 20 minutes."

Q: "Now, again, what time would this be, approximately?"

A: *"It would be between 4:30 and 5:15."*

Q: *"Just yes or no, did you then direct Detective Palumbo to do something with respect to Peter Quartararo?"*

A: *"Yes, I did."* [5]

Trial Tr. at 1706 (emphasis added). At this point, defense counsel again objected, and the parties had a lengthy sidebar at which defense counsel argued the very objection that is the subject of this appeal.

*Detective Reck's Testimony.*

Detective Reck testified the morning following Sergeant Jensen's testimony. After answering several background questions about his involvement in the investigation prior to April 28, 1979, Reck explained that he questioned Ryan at the police station and acknowledged several interruptions by Jensen during the course of the interview. Reck then testified to the following:

Q: *"At about 4:30, did there come a time that you, again, were called out from the room that you were in?"*

A: *"Yes, sir."*

Q: *"When you were called out from the room, did you have a conversation with somebody?"*

A: *"Yes, sir."*

Q: *"Who was that person?"*

A: *"Sergeant Jensen."*

Q: *"Just yes or no, did he tell you certain things? Did he tell you certain information?"*

Mr. Hochbaum: "Objection."

The court: "Overruled."

Q: "Just yes or no?"

A: *"Yes, sir."*

Q: "Now, as a result of what Sergeant Jensen—"

Mr. Hochbaum: "Objection."

The court: "Let him finish the question."

Mr. Hochbaum: "We know how it's being phrased. He's already indicated how he's phrasing it."

The court: "Overruled."

Q: *"As a result of the information that Sergeant Jensen had given to you at 4:30, did you then go back into the room with Thomas Ryan?"*

A: *"Yes, sir."*

Q: "Just yes or no?"

A: "Yes, sir."

Q: *"And as soon as you got back into the room, did you say something to him initially about what had been told you [sic]?"*

Mr. Hochbaum: "Objection, Judge."

The court: "Overruled."

A: *"Yes, sir, I did."*

Q: *"Now, after telling Thomas Ryan those things, did you advise him of his rights?"*

A: *"Yes, sir, I did."*

Trial Tr. 1768–70 (emphasis added). Thus, Reck's testimony reinforced Jensen's testimony that, after Jensen spoke with Reck, Reck read Ryan his rights.

The testimony continued to include more references to Ryan's reactions to statements made by Reck after Reck spoke to Jensen:

Q: "Now, at about 5:15, did there come a time you, again, left the room—just yes or no?"

**5.** Later during the course of Jensen's direct examination, the prosecutor asked a series of similar questions to suggest that Jensen also instructed Palumbo to arrest Peter Q. that afternoon.

A: "Yes, sir."

Q: "Where did you go?"

A: "I went, again, to the working squad office room, the main office room in the Homicide Detectives' Office."

Q: "And did you speak with someone at that time?"

A: "Yes, I did."

Q: "Who?"

A: "Detective Sergeant Jensen."

Q: "Again—just yes or no, don't tell us what was said—did Sergeant Jensen give you more information at that point."

Mr. Hochbaum: Objection, Judge, he's characterizing.

The court: Overruled.

A: "Yes, sir, he did."

Q: "And as a result of the information that Sergeant Jensen then gave you—just yes or no—did you go back into the room with Thomas Ryan?"

A: "Yes, sir, I did."

Q: *"Now, immediately on going back into that room with Thomas Ryan—again, Detective, just yes or no—did you say certain things to him about that which had been told to you outside the room?"*

Mr. Hochbaum: Objection.

The court: Overruled.

A: "Yes, sir, I did."

Q: "And after you said those things to him, did he then say something to you?"

A: "Yes, sir, he did."

Q: "Don't tell us what you said to him, just tell us what Thomas Ryan then said to you?"

A: "He said to me that night they had dropped Brensic off for the minibike .... and Michael Quartararo said to John Pius some remark, and I had

asked him why Michael Quartararo, and he had said that Michael Quartararo hated Pius' guts because there was a couple of fights."

He said, 'Yes, it's true, that on route to the house, the Quartararo house, myself and Brensic, and in some little degree, Michael Quartararo discussed the fact that John Pius was going to be a squealer, and that they had to go back and shut him up.'

He said he drove the car to the Quartararo house. They let the—took the minibike out, put it into the Quartararo house. They drove back to the school with the intentions of looking for John Pius.

"When they got there, they got out of the car, they—he and Brensic got out of the car, went around the school looking for John Pius, but they didn't find him."

Trial Tr. 1771–73 (emphasis added).

Later on, the People's questioning again made clear the communication of information between Reck and Jensen:

Q: "Now, Detective Reck, after [Ryan] gave you that statement——just yes or no, did you have another conversation with him after that was taken?"

A: "Yes, sir."

Q: "And after having that conversation, did you then leave the room and talk with Sergeant Jensen, again?"

A: "Yes, sir."

Q: "Just yes or no, at that time did Sergeant Jensen give you information about the case?"

Mr. Hochbaum: Objection.

The court: Overruled.

A: "Yes, sir."

Q: "As a result of the information he had given you at that time, did you go back in and talk with Thomas Ryan?"

A: "Yes, sir, I did."

Q: "And at that point—again, just yes or no—did you and Thomas Ryan have a conversation about that which had been told to you?"

A: "Yes, sir, we did."

Trial Tr. 1783–84.

Throughout Jensen's and Reck's testimonies, defense counsel made numerous objections and twice moved for a mistrial, arguing "that [the] inference [from their testimony] is that Detective Palumbo got information from Peter Quartararo which then led to the arrest of Robert Brensic and Thomas Ryan, and this Court is well aware of the prior rulings in this case which have indicated that those statements were not only taken in violation of Mr. Quartararo's rights, but also that they were inadmissible. They were unreliable, as a matter of law, . . ."

The court denied the first motion for a mistrial and overruled all the objections, without explaining why. Defense counsel continued to object throughout Jensen's testimony, and, the next day, in a conference before the start of Reck's testimony, counsel renewed his motion for a mistrial and his objections, both to Jensen's testimony the preceding day and to Reck's anticipated testimony. The court again denied the defense's motion for a mistrial and also denied the alternative request to strike Jensen's testimony.

In the conference, the prosecutor had inexplicably insisted, "I have a right to bring out Peter's confession." However, the court instructed the prosecution that it could not introduce Peter Q.'s confession and further ruled that it could not use the confession as "the basis of the statements" in Reck's testimony. The transcript from the conference establishes that the court fully understood the defense's objections and was aware of the very argument Ryan raises here. In fact, the court stated in conclusion that the prosecutor could not ask Reck questions that elicited answers based on Peter Q.'s confession. However, as the testimony quoted above shows, this is exactly what it did allow. Defense counsel continued to object throughout Reck's testimony, but the court overruled all the objections without explanation.

In addition to the testimony of Reck and Jensen, the prosecutor, in summation, made several comments referring to the interrogations that resulted in the confessions and accusations. First, the prosecutor reminded the jury how Jensen brought Ryan and Peter Q. to the station and reviewed the conversations between Reck and Ryan. Then the prosecutor reminded the jury that Ryan changed his story after Reck confronted him with information from Jensen:

"'Let me tell you the whole story,' [Ryan] says. Why did he tell the whole story? *Because it was being told to him. Information was being told to him—*"

Mr. Hochbaum: "Objection."

The court: "Overruled."

Trial Tr. at 244–45 (emphasis added).

Shortly after that, in an attempt to highlight the apparent inconsistencies, the prosecutor stated:

"See, I thought at 1:45 he said that they were up at the high school that night. Then at 3:20, all they did was steal a minibike. He didn't want to tell the police that because he was upset at stealing a worthless piece of garbage. *But then at 4:30, all of a sudden things change.*"

Trial Tr. at 249 (emphasis added). During deliberations, the jury requested the court to have Reck's testimony read back. The jury did not request the rereading of any other witness's testimony.

Post-trial, the court conducted a hearing to investigate allegations of juror misconduct, but the court rejected Ryan's claim and denied Ryan's motion to set aside the verdict on all grounds. The Appellate Division, Second Department, denied Ryan's appeal on May 30, 1995, *see People v. Ryan*, 215 A.D.2d 786, 627 N.Y.S.2d 410 (N.Y.App.Div.1995), and the Court of Appeals (Simons, *J.*) denied leave to file an appeal on August 21, 1995, *see People v. Ryan*, 86 N.Y.2d 801, 632 N.Y.S.2d 515, 656 N.E.2d 614 (N.Y.1995). United States District Court for the Eastern District of New York Judge Joanna Seybert denied Ryan's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on January 26, 2001. *See Ryan v. Miller*, No. 96 Civ. 9132(JS), slip op. (E.D.N.Y. Jan. 26, 2001) (judgment entered Jan. 31, 2001). After Ryan filed a timely notice of appeal and motion for a certificate of appealability, this Court granted his motion for a certificate on August 28, 2001.

## Discussion

"We review *de novo* the denial of a petition for a writ of habeas corpus brought under 28 U.S.C. § 2254." *Chalmers v. Mitchell*, 73 F.3d 1262, 1266 (2d Cir.1996) (emphasis omitted); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 808 (2d Cir.2000).

### I. The Deferential Standard of 28 U.S.C. § 2254.

▮▮▮ 28 U.S.C. § 2254(d)(1), which governs the granting of a writ for applicants in state custody, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

Thus, if the state court adjudicated Ryan's claim on its merits, we must determine whether it unreasonably applied clearly established federal law in rejecting Ryan's Confrontation Clause claim. *See Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."); *Sellan v. Kuhlman*, 261 F.3d 303, 309–10 (2d Cir.2001). "Under § 2254(d)(1), we must determine not whether the state court was *incorrect or erroneous* in rejecting [petitioner's] . . . claim, but whether it was '*objectively unreasonable*' in doing so." *Sellan*, 261 F.3d at 315 (emphasis added). To show "an unreasonable application," petitioner must identify "[s]ome increment of incorrectness beyond error." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000); *see also Fuller v. Gorczyk*, 273 F.3d 212, 219 (2d Cir. 2001) (noting that the court may not grant the writ because it "simply disagreed with the [state court's] application" but must "adequately identify why it found the decision . . . to be 'objectively unreasonable' "). However, in order for this deferential standard of § 2254 to apply, we must first determine that the state court considered Ryan's Confrontation Clause on its merits. *See Sellan*, 261 F.3d at 309–10.

▮▮▮ The Appellate Division decision affirming Ryan's conviction did not specifically address Ryan's Confrontation Clause challenge, but it did include the blanket statement, "The defendant's remaining contentions are either unpreserved for ap-

pellate review or without merit." *Ryan,* 215 A.D.2d at 786, 627 N.Y.S.2d 410. A state court need not analyze each individual claim or cite federal law in order to adjudicate a claim, so long as it states it is disposing of the claim on the merits, and it issues a judgment. *See Aparicio v. Artuz,* 269 F.3d 78, 93–94 (2d Cir.2001) ("So, to invoke the deferential standards of AEDPA, the state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required."); *Sellan,* 261 F.3d at 312 ("[A] federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.").

We have found a claim "adjudicated on the merits," triggering the AEDPA standard of review, where the claim was dismissed by the state court with the blanket phrase, " '[D]efendant's remaining contentions are without merit.' " *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir.2002) (quoting *People v. Brown,* 242 A.D.2d 730, 730, 664 N.Y.S.2d 929 (N.Y.App.Div.1997)). Here, the state court was even less specific, using the disjunctive phrase, "The defendant's remaining contentions are *either* unpreserved for appellate review *or* without merit." ' *Ryan,* 215 A.D.2d at 786, 627 N.Y.S.2d 410 (emphasis added). There is no reason, however, to doubt that AEDPA applies in this situation because the only alternative to finding the claim adjudicated on the merits would be finding the claim procedurally barred, in which case we would not have entertained the claim in the first instance (absent a showing of cause and prejudice). Moreover, in our jurisprudence regarding exhaustion of remedies in the habeas context, we have confronted this same disjunctive language and held that when a state court employs such language, "the validity of the claim is preserved and is subject to federal review." *Fama,* 235 F.3d at 810. Given that neither party disputes that Ryan properly objected and preserved his Confrontation Clause challenge for review, and given that "there is nothing in [the state court's] decision to indicate that the claims were decided on anything but substantive grounds," *Aparicio,* 269 F.3d at 94, we read the state court's opinion as having adjudicated Ryan's claim on its merits. Thus, the unreasonable application standard of AEDPA applies.[6]

---

**6.** We note that the case of *Rudenko v. Costello,* 286 F.3d 51 (2d Cir.2002), is distinguishable on the facts. In *Rudenko,* the district court decisions denying the habeas petitions relied completely on the Appellate Division decisions denying the appeals. 286 F.3d at 57 ("[T]he district judge to whom the action was assigned denied the petition in an order adopting, without elaboration, the reasons stated by the state appellate court in affirming the petitioner's conviction...."). Such a decision left this Court without "an indication of its rationale that is sufficient to permit meaningful appellate review." *Id.* at 65. Here, Judge Seybert rejected Ryan's habeas petition after extraordinarily careful independent analysis, which she detailed in the resulting seventy-two page decision. Thus, the district court decision was more than "sufficiently informative to permit meaningful appellate review." *Id.* at 64. Further, in *Rudenko,* it could not be determined whether the Appellate Division denied the appeals on the merits of the claims or on procedural grounds. *See id.* at 68–73. Here, the record clearly establishes that Ryan preserved his Confrontation Clause claim at every stage of this case. Indeed, respondent concedes that the claim is properly preserved. Therefore, although the Appellate Division decision denied Ryan's Confrontation Clause claim, along with a number of other claims, as "either unpreserved for appellate review or without merit," *Ryan,* 215 A.D.2d at 786, 627 N.Y.S.2d 410, the record establishes that Ryan properly pre-

The deferential standard of § 2254, combined with this Court's *de novo* review of the district court's decision denying the writ, means that this Court reviews *de novo* the district court's decision holding that the state court did not unreasonably apply clearly established federal law in denying Ryan's Confrontation Clause claim.

*II. Confrontation Clause.*

■ The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination. *See Bruton v. United States,* 391 U.S. 123, 128, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding defendant "was denied his constitutional right of confrontation" where the government introduced codefendant's statement that implicated defendant "in a form not subject to cross-examination, since [codefendant/accuser] did not take the stand"); *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994) ("A defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him.") (citing *Bruton,* 391 U.S. at 137, 88 S.Ct. 1620).

■ Rights under the Confrontation Clause are intertwined with but are separate from the rules prohibiting hearsay testimony. *See Ohio v. Roberts,* 448 U.S. 56, 62, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (examining "the relationship between the Confrontation Clause and the hearsay rule"). Hearsay is an out of court assertion introduced in court for the truth of the matter asserted. *See* Fed.R.Evid. 801. Thus, accusatory assertions introduced without the testimony of the accuser not only violate the Confrontation Clause, but they also violate rules against hearsay. Of course, although all assertions that violate the Confrontation Clause will also be a form of hearsay, not all assertions that hearsay rules prohibit will run afoul of the Confrontation Clause. The Confrontation Clause targets only that testimony that contains accusations against the defendant.

One important reason justifying the exclusion of assertions accusing the defendant without the testimony of the accuser is that " 'their credibility is inevitably suspect,' " and so the evidence is unreliable. *Mason,* 16 F.3d at 42 (quoting *Bruton,* 391 U.S. at 136, 88 S.Ct. 1620). However, "the *Bruton* problem arises not only when the hearsay evidence is unreliable but, because of the Sixth Amendment right to confrontation, [w]henever the codefendant's statement, admission, or confession inculpates the objecting defendant, regardless of the possible truth of the accusation." *United States v. Danzey,* 594 F.2d 905, 918 n. 13 (2d Cir.1979). The Supreme Court has addressed the problem of reliability numerous times. *See, e.g., Roberts,* 448 U.S. at 66, 100 S.Ct. 2531 (noting that a hearsay "statement is admissible [under the Confrontation Clause] only if it bears adequate 'indicia of reliability' "). This concern with the credibility and reliability of an assertion containing an accusation is especially relevant in a case such as Ryan's because at the time of his trial, several courts had

served this claim. Therefore, it is clear that the Appellate Division denied the Confrontation Clause claim as "without merit." *Id.* Thus, it is a "claim that was adjudicated on the merits in State court proceedings," and AEDPA deference applies. 28 U.S.C. § 2254(d).

found Peter Q.'s confession, and therefore the accusations contained within, unreliable as a matter of law. Thus, if we find that Jensen and Reck's testimony did relay Peter Q.'s accusation against Ryan, its admission cannot be justified on the alternate theory that it contained sufficient indicia of reliability.

■ In determining whether a right is clearly established under federal law as determined by the Supreme Court, we note that although the Supreme Court must have acknowledged the right, it need not have considered the exact incarnation of that right or approved the specific theory in order for the underlying right to be clearly established. *See, e.g., Sellan,* 261 F.3d at 309 ("The *Williams* Court thus clarified that for AEDPA purposes, it matters only that the *Strickland* performance and prejudice test has been 'clearly established'—not that a particular theory of ineffective assistance derived from *Strickland* has been clearly established."); *see also Kennaugh v. Miller,* 289 F.3d 36, 45 (2d Cir.2002) ("[A] state court determination is reviewable under AEDPA if the state court decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed."). Although *Bruton* addressed a direct accusation as presented through a non-testifying codefendant's statement, the case clearly established the general right to confront one's accuser, as the Sixth Amendment guarantees. Therefore, we may properly consider situations involving derivations of the facts in *Bruton.*

■ Testimony need not contain an explicit accusation in order to be excluded as a violation of the Confrontation Clause. "To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly but may contain an accusation that is only implicit."

*Mason,* 16 F.3d at 42–43. Likewise, testimony need not be explicit to qualify as hearsay. *See United States v. Reyes,* 18 F.3d 65, 69 (2d Cir.1994) ("Hearsay is evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement."); *United States v. Reynolds,* 715 F.2d 99, 103 (3d Cir.1983) ("[S]tatements containing express assertions may also contain implied assertions qualifying as hearsay and susceptible to hearsay objections."). Although the Supreme Court has held that a codefendant's statements containing accusations against the defendant may be admissible against the defendant if the statements are properly redacted so that all reference to the defendant is eliminated, *see Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (holding that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence"), the Court has also held that even redacted statements cannot be admitted if they include obvious or implied references to the defendant, *see Gray v. Maryland,* 523 U.S. 185, 196, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (holding that "statements that, despite redaction, obviously refer directly to someone, often obviously the defendant" allow the jury to make sufficient inferences of an accusation to violate *Bruton* ). Thus, testimony that indirectly includes an accusation against the defendant may violate the Confrontation Clause even if the testimony is not a direct reiteration of the accusatory assertion.

■ Furthermore, it is well established in this Circuit that lawyers may not circumvent the Confrontation Clause by introducing the same substantive testimony in a different form. "In general, this

Court has condemned practices designed to circumvent these principles by asking a witness what he *learned* from an out-of-court declarant," as opposed to asking what an out of court declarant *said. Mason,* 16 F.3d at 43 (emphasis added). If the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible. "The fact that the content of [the co-conspirator's] statement to [the detective] was not revealed in detail was immaterial, *for the plain implication* that the prosecutor sought to elicit, and emphasized in his summation, *was that the conversation with [the co-conspirator] led the police to focus on [the defendant]." Id.* (finding the testimony contained an implicit accusation and constituted reversible error) (emphasis added); *Reyes,* 18 F.3d at 69 ("[A]lthough the jury was not told exactly what words [the codefendants] had spoken, *[the witness's] testimony clearly conveyed the substance of what they had said.")* (emphasis added); *Danzey,* 594 F.2d at 917, 918 (holding that testimony that "[the codefendant] had named the nine men although none of the names were mentioned" violated the Confrontation Clause because "[e]ven on the agent's testimony that names were named, the jury could readily infer that [the defendant] was among them"); *People v. Cruz,* 100 A.D.2d 882, 883, 474 N.Y.S.2d 142 (N.Y.App.Div.1984) ("The prosecutor's questioning of [the witness] concerning a conversation with [a non-testifying witness], which directly preceded [the witness's] testimony that he made two arrests in the case was improper inasmuch as *it was designed to create the impression in the jurors' minds that [the non-testifying witness] had implicated the defendant. ...");* *see also United States v. Figueroa,* 750 F.2d 232, 240 (2d Cir.1984) ("[F]rom a practical standpoint, [the witness's] testimony became a recital by [the informant]

of proposals made by the recipient of the phone calls [believed to be the defendant].... [Thus,] the government successfully introduced crucial information while shielding the source of that evidence—the informant—from potentially devastating cross-examination."); *Reynolds,* 715 F.2d at 101 (finding that inspector's testimony that the codefendant told the defendant, "I didn't tell them anything about you," violated the Confrontation Clause); *People v. Felder,* 108 A.D.2d 869, 870, 485 N.Y.S.2d 576 (N.Y.App.Div.1985) (holding erroneous testimony that "the complainant made a response following which 'we patted down both subjects, placed them in handcuffs, and removed them from the bar,' " because "[e]ven though his response was not admitted into evidence, the testimony left the jurors with the clear impression that he was particularly sure and that the arrests were made as a result of this response"). Such hearsay testimony containing implicit accusations violates the Confrontation Clause.

■ Ryan's case resembles the facts in *Mason v. Scully,* 16 F.3d 38 (2d Cir.1994). In *Mason,* the main police investigator testified to the arrest of the three co-conspirators. In explaining how the police focused on the defendant, the police investigator testified as follows:

> Q. And, after the lineup [in which [the victim] identified [a co-conspirator]], was a conversation held with [that co-conspirator]?
>
> This is a yes or no question.
>
> A. Yes.
>
> Q. And, after this conversation with [the co-conspirator], were you looking for somebody?
>
> A. Yes, I was.
>
> Q. And, who were you looking for?
>
> A. Terrence Mason.

*Id.* at 40. Thus, as in Ryan's case, the police testimony did not "reveal[ ] in detail" "the content of [the codefendant's] statement to [the detective]." *Id.* at 43. However, the Court found this "immaterial, for the plain implication that the prosecutor sought to elicit, and emphasized in his summation, was that the conversation with [the codefendant] led the police to focus on [the defendant]." *Id.* at 43. The Second Circuit held this type of testimony containing implicit accusations violates the Confrontation Clause. *See id.; cf. United States v. Check*, 582 F.2d 668, 679 (2d Cir.1978) (holding that a witness's testimony about what he said to an informant, in response to what the informant told the witness about the informant's conversation with the defendant, qualified as hearsay because "in substance, significant portions of [the witness's] testimony ... was a transparent attempt to incorporate into the [witness's] testimony information supplied by the informant who did not testify at trial.").

Ryan argues that, as in the *Mason* case, the officers' testimony, while not repeating an explicit accusation against Ryan, left the jury with nothing to conclude other than that Peter Q. had accused Ryan because Jensen and Reck testified that Jensen instructed Reck to charge Ryan with murder after learning from Palumbo what Peter Q. said. Conversely, respondent argues that the testimony was not hearsay because it was simply "a nebulous reference to an unelaborated verbal communication" and because neither officer's testimony directly revealed the source or the content of the conversation between Jensen and Reck. This, however, misses the point of Ryan's argument. The relevant question is whether the way the prosecutor solicited the testimony made the source and content of the conversation clear. That is, did the testimony make obvious to the jury the content of the conversation—

an accusation against Ryan—and the source—Peter Q.—even though it did not directly state this information.

Respondent argues that *Mason* is distinguishable because the *Mason* Court noted that "there was no police work that turned up [the defendant], and the only lead to him obviously came from [the detective's] conversation with [the co-defendant]," *Mason*, 16 F.3d at 44, whereas in this case, independent police investigation, not just Peter Q.'s accusations, led the police to focus on Ryan. We reject this contention that *Mason* is distinguishable. First, we note that the cases are not as factually dissimilar as respondent suggests. In *Mason*, the police were apparently unaware of Mason's identity until they spoke with his codefendant. Therefore, the detective's testimony that the police were looking for Mason as a result of speaking with the codefendant violated the Confrontation Clause because "the plain implication" of the testimony was that the codefendant implicated Mason. *See id.* at 43. In this case, the police were obviously already aware of Ryan's identity at the time of Peter Q.'s confessions because they had him in the police station and were interviewing him as a potential witness. However, as the People presented the case to the jury through Jensen's and Reck's testimony, the police did not become aware of Ryan's identity as a potential *suspect*, as opposed to a *witness*, until they spoke with Peter Q. Regardless of whether the police, in fact, had independent reasons to suspect Ryan—and we note that it does not appear from the record before us that they did—the prosecution did not present evidence of any other independent investigation or efforts that led the police to charge Ryan. Thus, like in *Mason*, the prosecutor's questioning created the impression for the jury that Peter Q.'s statements to Palumbo led the police to focus on Ryan as a suspect.

Therefore, as in *Mason,* the testimony violated the Confrontation Clause because "the plain implication" of the testimony was that Peter Q. accused Ryan.

██ Second, regardless of whether the facts of Ryan's case are more similar or dissimilar to the facts of *Mason,* we find that any factual differences are unimportant. Even if, unlike *Mason,* more than Peter Q.'s confession led the police to focus on Ryan, the testimony explaining the course of events still inculpated Ryan based on Peter Q.'s accusations without presenting Peter Q. Thus, the testimony violated the Confrontation Clause. Indeed, the Confrontation Clause does not contain an exception allowing hearsay accusations as long as the police could have suspected the defendant without the accusations. The fact that Peter Q.'s confession may not have been the only information that led the police to Ryan may affect the prejudice resulting from admission of the improper testimony, but it does not alter the fact that the testimony contained an implicit accusation in violation of the Confrontation Clause. In *Mason,* the Court noted this fact in explaining the *significance* of the Confrontation Clause violation. However, the fact that the police were not already aware of the defendant was not the essence of the violation of the Confrontation Clause. The essence of a violation of the Confrontation Clause is the presentation of an accusation against the defendant without presenting the accuser. *See Bruton,* 391 U.S. at 136, 88 S.Ct. 1620. We find Peter Q.'s accusation was implicit in Jensen's testimony that he instructed Reck to read Ryan his rights as to the charge of murder. By allowing this testimony, the state court unreasonably applied the principle of *Bruton* to the facts of Ryan's case.

Reck's testimony was less obvious than Jensen's. He testified that he received instructions from Jensen to advise Ryan of his rights, but it was not as clear that Jensen instructed him to do so as a result of Jensen's conversations with Palumbo. However, Reck testified directly following Jensen, and both of their testimonies were relatively short. It is unreasonable to assume a jury would forget that Jensen had just testified that he received information from Palumbo that led him to instruct Reck to arrest Ryan. Furthermore, the prosecutor's comments on this in summation tied the two testimonies together. Jensen's and Reck's testimony, in context and considered along with the prosecutor's summation, presented an implicit accusation from Peter Q. against Ryan. Further, the prosecutor emphasized this connection in the choice of language he used in eliciting the information. (For example, *"as a result of* talking with Detective Palumbo.")

██ Of course, the fact that respondent violated the Confrontation Clause as interpreted in *Mason* does not by itself support the conclusion that the state court unreasonably interpreted clearly established federal law. To reach that conclusion we must find that the state court's judgment unreasonably interpreted Supreme Court holdings. *See Williams,* 529 U.S. at 412, 120 S.Ct. 1495. We hold that the state court was objectively unreasonable in not finding a Confrontation Clause violation by applying *Bruton* to the facts of this case. A core concern of *Bruton* was that the credibility of a co-defendant's statement is always suspect. 391 U.S. at 136, 88 S.Ct. 1620. Not only was Peter Q.'s confession subject to this general proposition, but two courts have found it to be specifically unreliable on particularized grounds. The People's direct and clear suggestion that police gave Ryan *Miranda* warnings because of what Peter Q. said is not meaningfully distinct from testimony repeating those portions of Peter Q.'s tes-

timony that inculpated Ryan. Therefore, it was objectively unreasonable not to find a Confrontation Clause violation based on Reck's and Jensen's testimony. *See Williams*, 529 U.S. at 408–11, 120 S.Ct. 1495 (holding that in order to merit habeas relief, a state court must not only apply "clearly established federal law erroneously or incorrectly," but it must also apply it in a way that is "objectively unreasonable"); *Francis S.*, 221 F.3d at 113 (holding that "only a small increment beyond error is needed to meet the standard of 'objectively unreasonable'" of § 2254). We hold the state court unreasonably applied clearly established federal law governing the Confrontation Clause in allowing the testimony.[7]

*III. Background Exception.*

 In its opinion rejecting Ryan's claim, the district court found that the testimony of Jensen and Reck was admissible "for the understanding of a sequence of events, … to show how the investigation developed and in order to avoid speculation as to the subsequent actions of the police which led to the petitioner's arrest."

Respondent argues this theory on appeal, contending that it needed to elicit the testimony of Jensen and Reck in order to explain why Ryan was at the police station on April 28, 1979, and to explain the course of the investigation that led to Ryan's arrest on October 23, 1981. Ryan argues that this testimony was irrelevant to any material issue in the case and was not necessary to provide background and, ironically, did *not* explain why he was at the police station. Rather, Ryan contends that the sole purpose of Jensen's and Reck's testimony was to inform the jury that the police charged Ryan with murder after Peter Q. confessed to Palumbo and accused Ryan.

 Testimony containing hearsay may be admissible not for its truth but as background information if (1) "the non-hearsay purpose by which the evidence is sought to be justified is relevant," and (2) "the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." *Reyes*, 18 F.3d at

---

7. The facts of this case clearly distinguish it from *Quartararo v. Hanslmaier*, 186 F.3d 91 (2d Cir.1999), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000), in which this Court reversed the lower court's grant of the writ of habeas corpus to Michael Q. and ruled that the indirect references to Peter Q.'s confession and accusations did not violate the Confrontation Clause. Although Michael Q. offered the same legal theory in support of his Confrontation Clause argument, the prosecutor elicited the testimony of the officers at his trial in a sufficiently different manner.

In Michael Q.'s case, the prosecutor's questioning did not make clear that the officers acted in response to information gained from Peter Q. or that Michael Q. made statements after he heard Peter Q.'s accusations. Specifically, the prosecutor elicited Palumbo's testimony in such a way that it would not have been obvious to the jury that Palumbo, who

was questioning Michael Q., received information from Peter Q. or Jensen. The testimony did not make clear from whom or where he received the information, if in fact he received any information at all. *See Quartararo*, 186 F.3d at 98. Further, the testimony did not even establish that the police confronted Michael Q. with new information. It did not contain the contemporaneous, back and forth exchanges between Peter Q.'s interrogator and Michael Q.'s interrogator that was so evident in the questioning at Ryan's trial. At Michael Q.'s trial, the prosecutor elicited testimony concerning Michael Q.'s arrest devoid of context, and the jury did not know that the police were also questioning Peter Q. Thus, the jury would not infer that Palumbo got his information from a confession and accusation made by Peter Q. Without allusion to an accusation, Michael Q.'s right to confrontation was not violated. *See id.* at 97–99.

70. Two common scenarios in which the admission of testimony as background evidence may be appropriate are as testimony "helpful in clarifying noncontroversial matter[s] without causing unfair prejudice on significant disputed matters," and as "appropriate rebuttal to initiatives launched by the defendant." *Id.; see, e.g., United States v. Gilliam,* 994 F.2d 97, 103 (2d Cir.1993) (finding that hearsay testimony, offered to rebut defense questioning, was permissible because, "The statement about the second gun was admitted ... under the theory that it was not offered to prove the truth of the matter asserted, but only to explain the actions of the police officers in returning to the scene.").

In analyzing the relevance and prejudice prongs of the background information test, the *Reyes* Court offered the following guidance:

Questions involved in the determination of the relevance and importance of such evidence include: (i) Does the background or state of mind evidence contribute to the proof of the defendant's guilt? (ii) If so, how important is it to the jury's understanding of the issues? (iii) Can the needed explanation of background or state of mind be adequately communicated by other less prejudicial evidence or by instructions? (iv) Has the defendant engaged in a tactic that justifiably opens the door to such evidence to avoid prejudice to the Government?

Questions involved in the assessment of potential prejudice include: (v) Does the declaration address an important disputed issue in the trial? Is the same information shown by other uncontested evidence? (vi) Was the statement made by a knowledgeable declarant so that it is likely to be credited by the jury? (vii) Will the declarant testify at trial, thus rendering him available for cross-examination? If so, will he testify to the same effect as the out-of-court statement? Is the out-of-court statement admissible in any event as a prior consistent, or inconsistent, statement? (viii) Can curative or limiting instructions effectively protect against misuse or prejudice?

*Reyes,* 18 F.3d at 70–71 (footnotes omitted).

██ The district court erred in concluding that the testimony of Jensen and Reck was admissible as background evidence. The testimony was not necessary or relevant to a material issue in the case—it did not offer an explanation for something about which the jury would be curious. The officers already had testified that Ryan was at the station because the police wanted to question him as a potential witness. The testimony did not explain the police's actions *after* April 28, 1979, and it did not explain Ryan's eventual indictment and arrest. Furthermore, even if the testimony was relevant, it should have been excluded under a standard Fed.R.Evid. 403 probative versus prejudice balance. The testimony addressed a hotly disputed issue—the circumstances under which Ryan was initially charged. Given the previous court decisions holding Peter Q.'s confession unreliable and inadmissible, to the extent the testimony relayed that information in an effort to explain why Ryan was initially charged and eventually arrested, the testimony was highly prejudicial. The testimony was only relevant if we assume its truth—that Peter Q. accused Ryan—which we cannot do. Because the testimony is only relevant to the very purpose for which the jury cannot consider it, it is not admissible testimony under the background exception.

*IV. Harmless Error Standard.*

██ We need not decide which harmless error standard applies to post-AED-

PA habeas cases. Before the enactment of AEDPA, courts applied two different harmless error standards. For cases on direct appeal, courts applied the *Chapman* standard, holding an error was harmless if it was "harmless beyond a reasonable doubt," meaning that the reviewing court found "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). For cases on collateral review, courts applied the more stringent *Brecht* standard, holding that an error was harmless if it did not result in "actual prejudice," that is, it did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

After the enactment of AEDPA, many courts have questioned whether they should continue to apply the pre-AEDPA *Brecht* standard to cases on collateral review, or whether courts should now apply a mixed AEDPA/ *Chapman* standard, examining "whether the state court's decision was 'contrary to, or involved an unreasonably application of' *Chapman*." *Noble v. Kelly*, 246 F.3d 93, 101 n. 5 (2d Cir.) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)), *cert. denied,* —— U.S. ——, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001). Post AEDPA Second Circuit cases have declined to rule on this issue, finding instead that the result is the same under either standard. *See, e.g., Loliscio v. Goord*, 263 F.3d 178, 185 n. 1 (2d Cir.2001) (noting *Chapman / Brecht* dispute post-AEDPA and declining to decide the issue because result is the same under either test); *Fuller*, 273 F.3d at 220–21 (noting that "the continued vitality of *Brecht* in light of amended § 2254 remains open in this circuit" but declining

to decide the issue because "the result would be the same [under *Brecht* ] as under our analysis that the state court did not 'unreasonably apply' the *Chapman* harmless error test on direct review"); *cf. Fuller*, 273 F.3d at 220–21 (noting that in *Lainfiesta v. Artuz,* 253 F.3d 151, 158 (2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1611, 152 L.Ed.2d 625 (2002), the Court applied the *Brecht* harmless error standard because "the state court did not apply the *Chapman* harmless error test on direct review, as it found no constitutional error"); *Wray v. Johnson*, 202 F.3d 515, 525–26 (2d Cir.2000) (applying the *Brecht* harmless error standard without discussion of the *Chapman* standard). Because we, too, find that the error was not harmless under either standard, we do not decide which test applies.

In *Latine v. Mann*, this Court stated that "it is virtually impossible to determine whether a jury did or did not ignore an inculpatory statement," and proceeded to outline factors the court should consider in deciding whether the evidence prejudiced the defendant, including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, and the overall strength of the prosecution's case." 25 F.3d 1162, 1167 (2d Cir.1994); *see also Wray*, 202 F.3d at 526 ("In our assessment of whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, the principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case."). Applying these factors to this case, we find that the testimony of Reck and Jensen greatly prejudiced Ryan. The testimony of these two officers was the lynchpin of the prosecution's circumstan-

tial case. It explained why and how the police initially charged Ryan and what statements he made in response to his being charged. A large portion of Jensen and Reck's testimony focused on the sequence of events, and it was not merely mentioned in passing. Furthermore, the testimony was not cumulative of other evidence, in part, because of the lack of other evidence. The evidence consisted of: medical testimony describing how Pius died and the actions causing his death, mainly to show intent; miscellaneous physical evidence that neither exculpated nor inculpated Ryan; testimony as to the time Pius was at the school and the time Ryan was at the school; and statements made by Ryan that could be interpreted as consciousness of guilt but could also be interpreted as responses to the stress of being under police investigation and community scrutiny for over two years. The evidence here was far from overwhelming.

Furthermore, the information elicited in the inadmissible testimony could not have been introduced in any other admissible way. In *Mason*, the Court found the evidence was not harmless, noting, "Here, there was no police work that turned up [the defendant], and the only lead to him obviously came from [the detective/witness's] conversation with [the co-conspirator]." 16 F.3d at 44. Likewise, in this case, it was not until Peter Q.'s accusation that the police suspected Ryan. Respondent acknowledges this in its argument that the police considered Ryan only as a potential witness who they thought might be covering up for another boy whom they suspected. Again, as in *Mason*, the prosecutor's reference to the erroneous evidence in his closing and the jury's request for a read back compounds the prejudice. *See Mason*, 16 F.3d at 41.

Finally, we note that the only other evidence of any significance that the prosecution presented was the testimony of Anne Della Piana [8], a former girlfriend of Ryan's, concerning some statements Ryan made to her in the year following the Pius murder, and some statements Ryan made after the police arrested him in October of 1981. Ms. Della Piana testified that in May of 1981, Ryan told her that "Peter's friends had told Peter to leave the State, and Peter didn't, and [Ryan] was concerned—his same friends were telling him to leave, and he didn't want to leave, but he was afraid that he would end up like Peter." She recounted several vague statements Ryan made expressing his concern about the case and his fear that he "was going to go away—to jail, I assume." Della Piana also testified that at some point Ryan told her "he couldn't shut his face out of his mind, but he did not say Johnny Pius' face." Finally, after an extraordinarily lengthy and largely unsuccessful attempt to refresh her recollection in which the prosecutor ultimately showed Della Piana portions of her diary, which was inadmissible, Della Piana testified to the following conversation on July 19, 1981: "He said that he was—he had nowhere to turn, or something like that, and he was afraid that he was going to go away, and he said, 'No one can help me. I have nowhere to turn.' And I said, 'I can help you.' And he said, 'No, you can't.' And I said, 'I can. Don't shut me out.' And I said, 'I care about you. I love you.' And he said, 'You can't love someone that took someone else's life.'"

Although not meaningless, none of these statements are clearly incriminating or express clear consciousness of guilt. In addition, on cross examination, Della Piana acknowledged the enormous publicity surrounding the Quartararo trial, which oc-

8. At the time of the statements, Ms. Della Piana was known as Anne Erickson.

curred during the time she was dating Ryan, and although she denied reading press accounts, she recognized the extraordinary publicity following the Pius murder and that many people in the community considered Ryan a murderer. Other than Ryan's statements to which Della Piana testified, which could be explained as much as a result of stress from the publicity as from guilt, the prosecution offered two statements Ryan made when the police arrested him on October 23, 1981: " 'I knew it was a matter of time, only a matter of time,' " and, " 'Can I ask you a question? Was it Anne?' "

Under either standard, the erroneous admission of the testimony of Officers Jensen and Reck was not harmless. The evidence in this case, while arguably sufficient, was not so overwhelming that this Court can conclude the effect of the inadmissible evidence on the jury's verdict was not substantial. *Cf. Figueroa,* 750 F.2d at 241 (noting in a direct appeal as among the factors "weigh[ing] heavily in favor of reversal. First, the hearsay testimony was the only evidence directly implicating [the defendant] in the conspiracy and distribution. Second, the government's case against [the defendant], while entirely sufficient, was not overpowering") (internal quotations omitted). Given the overall lack of evidence and the weakness of the existing evidence, this Court concludes that the admission of the testimony containing implicit accusations against Ryan had a substantial and injurious influence on the jury's verdict. *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. Thus, the error was not harmless, and we reverse the decision of the district court denying the writ.

### Conclusion

We find that the Appellate Division unreasonably applied clearly established Supreme Court precedent in denying Ryan's Confrontation Clause claim. The testimony of the two police officers constituted hearsay and contained implicit accusations against Ryan in violation of the Confrontation Clause. The error was not harmless, and so we reverse and remand for the granting of the writ of habeas corpus, conditioned on the state's right to retrial within ninety days.